## MATILDA HAM v. DEL. & H. CANAL CO.

142   617
155   553
155   556

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF SUSQUEHANNA COUNTY.

Argued March 16, 1891—Decided May 27, 1891.
[To be reported.]

1. When a hypothetical point prays for instructions upon the legal effect of certain facts therein stated, which are supported by evidence in the case, it is error to answer the point by simply submitting the facts to the determination of the jury, without giving them any instructions as to their duty, in case they should find the facts to be as stated.

2. A person who is ejected from a train, is not at liberty to walk upon the track of the railroad for any considerable distance, or for any distance more than is absolutely necessary to enable him to reach a position of safety; the presence of such person upon the track, at a point 4000 feet from where he was ejected, can be justified only by clear proof of imperious necessity.

3. It is the clear legal duty of one so ejected to adopt any means of egress from the track which should be made use of by a person of ordinary prudence for that purpose; and his disregard of such duty, even though it be due to a condition of partial intoxication, or the influence of a companion, will be negligence which will bar an action for his injury or death if struck by a train.

4. Although one who enters a train may have purchased a ticket entitling him to ride thereon, the conductor is entitled to have proof of that fact by seeing the ticket; and if, being unable to produce it, he refuse to pay fare, he may be ejected; but an actual tender of the fare before the train is stopped to eject him, by whomsoever made, must be accepted.

5. One who enters a train, mistakenly believing that he has in his possession a ticket issued by another company, which, according to a custom of the company operating the train in question, would be accepted for passage thereon, is not a trespasser in so doing, but will become such by a refusal to pay fare when he cannot produce his ticket.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 36 January Term 1891, Sup. Ct.; court below, No. 206 January Term 1889, C. P.

On January 2, 1889, Matilda Ham brought trespass against the President, Managers and Company of the Delaware &

Hudson Canal Company, for negligence alleged to have caused the death of the plaintiff's husband, James Ham. The defendant pleaded not guilty.

At the trial, on August 21, 1890, the following facts were shown:

On the morning of November 3, 1888, the plaintiff's husband, James Ham, a coal miner residing at Forest City, went from that place to Carbondale, about six miles distant, by the New York, Lake Erie & Western railroad. Before leaving Forest City, he purchased of the agent of the New York, Lake Erie & Western Railroad Company a ticket to Carbondale and return. In the afternoon of the same day, he started back to Forest City, taking a train of the defendant company which ran between the two places named upon the tracks of the New York etc. railroad. He was accompanied by his step-daughter and her infant child. Testimony for the defendant tended to show that he appeared to have been drinking, and was "sleepy and dozy." Other testimony tended to show that he was not intoxicated.

When the defendant's conductor came to collect the tickets of the passengers, Ham was unable to find the return coupon of the ticket he had purchased at Forest City. That ticket would have been good upon defendant's train, the invariable custom of the defendant being to accept tickets issued by the New York etc. Railroad Company, for passage between points on the latter company's road. Ham informed the conductor that he had purchased a ticket that morning at Forest City, as the ticket agent at that place would state. The conductor said he must have a ticket, or the regular train fare of twenty-five cents, otherwise he would eject him from the train. Finally, the conductor stopped the train and ejected him. Testimony for the plaintiff tended to show that both before and after the train was stopped for that purpose, Ham's step-daughter tendered to the conductor the twenty-five cents demanded, and that other passengers also offered to pay his fare for him before he was put off the train. This testimony was contradicted by witnesses for the defendant. When Ham was ejected, his friend Thomas Jones got off the train for the purpose of accompanying him.

The ejection of the deceased from the train occurred between

Charge of Court below.

three and four o'clock in the afternoon, when the train was about half way between Carbondale and Forest City. The place where he was put off was near the breaker of a colliery in active operation, though the exact point was in dispute on the testimony. At and about that place a retaining-wall, built in front of the coal breaker, extended along the railroad for a considerable distance, while on the other side of the railroad was the Lackawanna river. Testimony for the defendant tended to show that by means of an old road, intersecting the railroad, the deceased and Jones could have gained access to a public road leading to Forest City. Testimony for the plaintiff tended to show that this fact was not easily discoverable by observation by a person standing upon the railroad. Jones testified that the deceased and himself did not see that coal breaker, and that they looked for some road or path by which they might leave the railroad, but were unable to find any. There was also testimony tending to show that they could have walked along the river shore, from the place where they got off the train, to beyond the point where the deceased was injured. The facts in connection with these subjects are more fully stated in the opinion of the Supreme Court infra, where portions of the testimony are quoted. Ham and Jones concluded to walk along the track to Forest City, and started to do so. After they had proceeded from four thousand feet to a mile on their way, and while they were crossing a bridge known as No. 9, an engine of the New York etc. Railroad Company suddenly appeared. Ham was struck by the engine and knocked off the bridge, receiving injuries which caused his death.

The testimony being closed, the court, SEARLE, P. J., after reviewing the testimony, charged the jury in part as follows:

The conductor of a railroad train has a right to see the ticket of every passenger upon the train. The ticket is the evidence to the conductor of the right of the passenger to a ride upon it. Upon the neglect or refusal of a passenger to produce such ticket for the inspection of the conductor, it is the duty of the conductor to demand his fare, and upon refusal or neglect to produce his ticket or pay his fare, after giving him a fair opportunity, the conductor may stop the train and eject such

passenger from it.   And after causing the stoppage of the train, it is too late for such passenger to tender his fare.   [If, therefore, Ham, or any one for him, tendered to the conductor Knapp, the fare from Carbondale to Forest City, as demanded by Knapp, then Ham had a right to ride upon that train, and the conductor had no right to put him off, and the company is liable for the acts of its conductor in so ejecting him.] [4]   But if Ham got on the train with knowledge that he had not a ticket, and there was no offer to pay his fare until after the stoppage of the train, then the company had a right to put him off the train at such a place as was reasonably safe.

The main question in this case is as to the negligence claimed to have been committed by the defendant company, in putting Ham off their train at the place they did. . . . . And in the argument of the counsel in the case, the counsel for the defendant admits that it is the duty of a railroad in ejecting a trespasser from its trains, to eject him at a reasonably safe place. But, if the place where such trespasser is left is in fact dangerous, still if the trespasser, so put off, contributed to the injuries received by his own negligence in omitting to take such precautions as an ordinarily prudent man would under like circumstances, the carrier would not be responsible for such injuries.

When a railroad company ejects from its train a passenger rightfully upon it, at a dangerous place, and in seeking to reach a place of safety the passenger uses the ordinary care of a prudent person, and without any contributory negligence on his part, he receives an injury which the conductor of the train by prudent circumspection and ordinary thoughtfulness should have foreseen, the company is liable in damages to compensate for such injuries.   And when a man is in a position of danger, without negligence or fault of his own, he is not responsible for the results of an error of judgment committed in his attempt to get out of it. . . . .

The plaintiff's counsel have requested us to charge you:

1. If James Ham purchased a ticket at the New York, Lake Erie & Western office in Forest City, good to Carbondale and return, and which the defendant company was accustomed to accept on its trains the same as if issued by the defendant company, and he entered the car of the defendant believing

that he had such a ticket, then he was not a trespasser, but rightfully on defendant's train as a passenger.

Answer: This point is affirmed.[2]

2. If the jury find from the evidence that James Ham was rightfully on defendant's train, then, when his ticket was demanded by the conductor, it was the duty of the conductor to give him a reasonable time to search for and to produce his ticket; and if the conductor proceeded to eject him from the car without giving him reasonable time to search for his ticket, then the defendant was guilty of a wrong in ejecting him; and whether such reasonable time to search for his ticket was given, is for the jury to determine from the evidence.

Answer: This point is affirmed.

3. If the fare was tendered to the conductor by any person before he proceeded to stop the train, it was his duty to receive it, and he had no right to eject James Ham from the car; and if, under such circumstances, after a tender had been made of the fare, he stopped the train and ejected Ham from the car, the defendant must answer to the plaintiff for any damages she may have sustained by reason of such wrongful act on the part of the conductor, if James Ham was not guilty of contributory negligence.

This point is affirmed.[3]

The defendant's counsel have also submitted certain points in writing, asking us to instruct you:

4. That, there being no evidence that James Ham ever purchased a ticket from the defendants, it was his duty to see before entering their cars that he had a ticket that entitled him to ride upon the same; and there being no evidence in this case that he had such ticket, when he got on the train, the defendants owed no duty to him as to a passenger who had paid his fare to them, and upon his refusal to pay such fare upon this train, he might be treated by them as a trespasser and ejected from the train.

Answer: This point is refused. The undisputed evidence in the case shows that James Ham purchased a ticket at Forest City which entitled him to ride upon the train from which he was ejected, and if he entered that train supposing that he still had that ticket, he entered it as a passenger.[1]

7. That if a person is ejected from the cars along the track,

Charge of Court below.

at a place with which he is unacquainted, and in sight of a large coal breaker where a large number of men are generally employed, or in sight of dwellings, it is his duty to leave the railroad track if it is reasonably practicable so to do, and make diligent inquiries for a safe way to his destination. And if he fails to do this, and such act would be the conduct of a reasonably prudent man, and continues to walk upon the track, and is injured thereby, he is guilty of contributory negligence, and no recovery can be had for any such injury resulting in his death.

Answer: I will answer this point in connection with the eighth and eleventh points, which I will first read.

8. If the jury find from the evidence that James Ham was ejected from the cars in the vicinity of, and in sight of the northwest coal breaker of Simpson & Watkins; that he was unacquainted with the locality, and that the same could have been reached by him by the exercise of ordinary diligence, then it became his duty to go there, or to any houses in sight of the track which he could thus reach, for the purpose of inquiring the way to his destination ; and if he failed to do this, if such act would be the conduct of a reasonably prudent man, and if the jury further find that going to such breaker or houses would have placed him upon the traveled carriage road leading to his destination, then he would be guilty of contributory negligence by continuing to walk upon the track until overtaken and struck by an engine of the New York, Lake Erie & Western Railroad Company, and no recovery could be had for such injury in this case.

11. That if the jury find from the evidence, that James Ham was ejected from the cars near to, and in sight of the northwest breaker, and below the old road, crossing the track marked No. 4 upon the map, and that by the use of ordinary vision and prudence, he could have seen this road as he passed, it was his duty to have left the track at that point for the purpose of making inquiry as to his destination, if an ordinarily prudent man would have done so; and if he did not, he would be guilty of contributory negligence in still walking upon the track ; and for any injury sustained afterwards by the engine of the New York, Lake Erie & Western Railroad Company's road, no recovery could be had in this case.

Answer: These points that I have just read to you, the seventh, eighth and eleventh are refused; they require the court to affirm or negative alleged facts as having been proven. The questions contained in them are for the jury, and they are to find whether Ham's acts and conduct from the time he was left there, up to the time of his injury, were those of a reasonably prudent man; if they were, he was not guilty of contributory negligence.[5]

17. That if the jury find from the evidence that James Ham was put off at a place from which he could have discovered and gone upon a traveled road in safety, by the use of ordinary prudence, but that by reason of being partly intoxicated, or through the influence of Thomas Jones, who left the cars with him, he walked upon the track to bridge No. 9, where he was injured, the plaintiff cannot recover.

Answer: This point is refused, as drawn.[6]

—The jury returned a verdict for the plaintiff for $4,000. On August 26, 1890, judgment was entered upon the verdict, whereupon the defendant took this appeal, assigning for error:

1. The answer to defendant's point.[1]

2, 3. The affirmance of plaintiff's points.[2] [3]

4. The part of the charge embraced in [  ][4]

5, 6. The answers to defendant's points.[5] [6]

7. The charge as a whole was erroneous and misleading, and confused the jury.

*Mr. W. H. Jessup* ( with him *Mr. H. C. Jessup* ), for the appellant:

1. The defendant's fourth point should have been affirmed, and the plaintiff's first point refused. The deceased never bought a ticket of the defendant, and neither paid nor agreed to pay to it one cent for his passage. There was no contract relation existing between him and the defendant, and therefore he never became a passenger: 2 Am. & Eng. Encyc. of Law, 742; Penna. R. Co. v. Price, 96 Pa. 256; Bricker v. Railroad Co., 132 Pa. 1; Gardner v. Railroad Co., 51 Conn. 143 ( 50 Am. Rep. 12 ); Patterson's Ry. Acc. Law, 204. The fact that he had bought a ticket of another company entitling him to return to Forest City on that company's trains, which the defendant company would have received if tendered to it, did not make

a contract with the defendant, as he never made such tender. This is not the case of a passenger who has bought a ticket of the company, and has lost it. In such case, a contract relation has been created, and if, without knowledge of the loss, the person enters the company's cars, he is a passenger: Lake Shore etc. Ry. Co. v. Rosenzweig, 113 Pa. 519; Arnold v. Railroad Co., 115 Pa. 135.

2. There is no evidence that the deceased ever assented to the offer of any money to the conductor by any one; and a volunteer, by tendering money against the wish and consent of the deceased, could not constitute himself the latter's agent to tender fare for him, and thus create the contract relation of passenger. The court was therefore in error in affirming plaintiff's third point without qualification. Our seventh, eighth and eleventh points were all founded on the testimony in the case, and we were entitled to affirmative answers to them. This court has uniformly held that the use of a railroad track for walking is unlawful, and, except under some overpowering necessity, which was not shown in this case, it was the duty of the deceased to keep off the track: Railroad v. Norton, 24 Pa. 465; Mulherrin v. Railroad Co., 81 Pa. 366; Beach on Cont. Neg., 205; Pittsb. etc. Ry. Co. v. Collins, 87 Pa. 405; Moore v. Railroad Co., 99 Pa. 301.

3. The simple statement of the proposition embodied in our seventeenth point must carry conviction of its soundness. The mere fact that the person injured was intoxicated, at the time of the injury, will not relieve him from the legal consequences of his contributory negligence : Patterson's Ry. Acc. Law, 74; Keen v. Railroad Co., 61 Md. 154 (19 Am. & Eng. R. Cas. 321); Milliman v. Railroad Co., 66 N. Y. 642; Pittsb. etc. Ry. Co. v. Collins, 87 Pa. 405. If intoxication actually contributed to the injury, no recovery can be had : 4 Am. & Eng. Encyc. of Law, 79; Button v. Railroad Co., 94 Ind. 276 (18 Am. & Eng. R. Cas. 260); Loewer v. Sedalia, 77 Mo. 431 ( 2 Am. & Eng. Corp. Cas. 658) ; Little Rock etc. R. Co. v. Parkhurst, 36 Ark. 371 (5 Am. & Eng. R. Cas. 635); Railway Co. v. Valleley, 32 Ohio St. 345 (30 Am. Rep. 601) ; Thorpe v. Brookfield, 36 Conn. 320 ; Toledo etc. R. Co. v. Riley, 47 Ill. 514; Beach on Cont. Neg., 204, 391, 392 ; Abbott's Trial Ev., 585, § 12; Wynn v. Allard, 5 W. & S. 524. While the main

Arguments.

charge of the court below was clear and correct, we think the answers to points which are complained of were erroneous, and clearly misled the jury and confused them as to their duty.

*Mr. E. L. Blakeslee* (with him *Mr. W. D. B. Ainey* and *Mr.* *A. H. McCollum*), for the appellee:

1. The usage of the defendant company to accept such tickets as the one which the deceased had purchased at Forest City, makes him a passenger if he entered the car believing that he had that ticket with him: Lake Shore etc. Ry. Co. v. Greenwood, 79 Pa. 373; Phila. Traction Co. v. Orbann, 119 Pa. 41; Railway Co. v. Powell, 40 Ind. 37; Lake Shore etc. Ry. Co. v. Rosenzweig, 113 Pa. 519; Shearman & Redf. on Neg., 305; 3 Wood's Ry. Law, 1433, § 361. In such case, the conductor must allow reasonable time to search for the ticket, and the question what is a reasonable time is for the jury: Maples v. Railroad Co., 38 Conn. 557 (9 Am. Rep. 434); Hayes v. Railroad Co., 31 Alb. L. J. 469; 2 Wood's Ry. Law, 1408. Again; the duty of the conductor to accept the fare when tendered by another person on behalf of one who does not have it, is shown in 2 Wood's Ry. Law, 1409, 1434; Garrett v. Railroad Co., 8 Lea 438; O'Brien v. Railroad Co., 80 N. Y. 236.

2. But it is immaterial whether the deceased was a passenger or not, as even a trespasser may be ejected only in a safe place: Arnold v. Railroad Co., 115 Pa. 135; 2 Wood's Ry. Law, 1409. The seventh and eighth points of the defendant were faulty, in requiring that the deceased should take a particular course. There may have been twenty different things which twenty prudent men would have chosen to do differently. The simple question is, was the course which he did take one that a reasonably prudent man would pursue: Missouri etc. R. Co. v. Evans, 37 Am. & Eng. R. Cas. 144; Shearman & Redf. on Neg., 333. And when a passenger is ejected from a train, it is not necessarily negligent for him to walk upon the track: 2 Wood's Ry. Law, 1409.

3. Defendant's seventeenth point is wrong in several features. The duties of the deceased and the railway company are to be defined without reference to whether the former was drunk or sober: Missouri etc. Ry. Co. v. Evans, 37 Am. & Eng. R. Cas. 144; Beach on Cont. Neg., 391; and drunken-

ness, not contributing to the injury, cannot be set up as a defence: Maguire v. Railroad Co., 115 Mass. 239. The point assumes that the deceased was " partly intoxicated," but such assumption is not sustained by the testimony. No witness says he was "partly intoxicated." Moreover, it ignores the fact that to one prudent man the safer course might appear to be to proceed along the track,' and ignores the question whether the old road could have been traveled in safety after getting upon it. Nor is there any evidence that Jones induced the deceased to follow the railroad. We think that, having been put in a dangerous place, the deceased should not be held responsible for not having chosen the safer way.

OPINION, MR. JUSTICE GREEN :

The seventh, eighth, and eleventh points of the defendant were refused by the learned court below, because, as the court said, they required the court to affirm or negative alleged facts as having been proven. This was an altogether mistaken view of the points. They did not ask the court to make any direction as to the facts, but they did ask the court to instruct the jury as to the law, if they found the facts to be as stated in the points. The points were purely hypothetical, in the statement of the facts mentioned, and there was ample testimony in the case to justify their presentation, and to ask the instruction of the court to the jury upon their legal effect, if they were found to be as stated. The court gave no such instruction, nor any instruction whatever, upon the effect of the facts, if found by the jury. This, of course, was plain error. If there had been no testimony in the cause to sustain the facts suggested in the points, the court might have refused to submit them for want of evidence; but that was not done, and could not have been done without the gravest error. The learned court simply directed the jury to determine what the facts were, without giving them any instruction as to what was their duty, if they found them to be as stated in the points.

Upon an examination of the testimony, we find that the deceased was put off the cars at a point somewhat beyond a large breaker, at a colliery which was in active operation and upon which a considerable number of men and boys were constantly at work. There is some discrepancy in the testimony as to the

particular spot at which the deceased was put off the train.
All the witnesses on both sides practically agree that it was
between the breaker and a point a short distance below the
bridge No. 10. It was abundantly testified and not contradicted,
that there was a retaining-wall about six to eight feet high in
front of the breaker, and extending beyond it, on which a switch
track was laid connecting the main track of the railroad with
the breaker. The end of this switch track where it joined the
main road was a short distance below the bridge called No. 10
on the map and in the testimony, and very close to an old road
which crossed the railroad and connected with the old public
road leading from Carbondale to Forest City, passing in front
of the breaker. This old road was not in much use at the time
of the accident, but was used to a slight extent for hauling,
and to a greater extent by foot-passengers desiring to reach the
public road from the railroad. One of the owners of the col-
liery, W. G. Parke, said there was no difficulty in a man pass-
ing from the railroad up this old road in the direction of Forest
City, and never had been. It connects with the public road
from the breaker to Forest City at a very short distance from
the railroad.

As to the old public road itself, it was most thoroughly lo-
cated and identified by numerous witnesses, who had traveled
over it, and it was surveyed by a civil engineer, Walter Frick,
a few weeks after the accident. His field-notes were produced
in court, and from these and his work on the ground he made
a map showing the entire locality, including the breaker, a
number of buildings along the road, the road itself, the railroad,
the river, the bridges, the cuts and fills along the track, the re-
taining wall, and the switch. This draft or map was fully
identified and given in evidence on the trial. We have dis-
covered no evidence which in any degree justifies the assertion
that it was "thoroughly deceiving," "absolutely incorrect," or
"misleading," as is alleged in the appellee's argument. The
testimony proving the existence and constant use of the old
public road from the breaker to Forest City is simply over-
whelming. There were a number of dwelling-houses along
that road, which were served with meat by a butcher who
traveled it constantly for that purpose ; all the teaming to and
from the colliery was conducted over it; it was rough and

stony, but entirely passable for teams and foot-passengers. The old road leading from the railroad to this public road, although it had been abandoned for general public use, was neither closed up, nor was it at all inaccessible to foot-passengers, and its locality was still visible on the ground. Besides this means of access to the public road, all the witnesses, both for the plaintiff and defendant, who spoke upon the subject, said that there was direct access to the breaker over the switch which connected it with the railroad, and there was no difficulty in reaching the breaker by that mode.

The point at which the deceased was put off was not exactly identified, but it was placed by the plaintiff's witnesses very near to the junction of the switch with the main track, and also to the old road, which was a short distance below the bridge No. 10. A very slight search for an outlet to the breaker would have disclosed the switch, and an equally slight search would have discovered the old road. But the men did not make any such search. Thomas Jones was with the deceased, and went with him until Ham was struck at bridge No. 9; and he testified, on cross-examination, that " we stayed and considered what to do, and we thought it was just about as near for us to go to Forest City as to go back," and then they started on. They walked on the track of the railroad towards Forest City till they reached bridge No. 9, where Ham was struck by an approaching locomotive. At this point Jones said that it was about seven or eight feet from the bridge down to the water of the river, and that, though he fell that distance, he was not hurt, but Ham, being struck by the locomotive, was so injured that he died the next day. The plaintiff alleges that it was four thousand feet from the point where Ham was ejected to the place where he was struck, and the defendant says it was about a mile; but, whether it was the one distance or the other, it is evident that the presence of the men on the track at so remote a point cannot be justified, except upon clear proof of a most imperious necessity. Of that kind of proof we can discover none in this case. A number of witnesses testified that the houses and the public road could be seen from the railroad track at various points along the railroad. Even granting that the railroad was laid between a bank on the one side and the river on the other, the bank was of very moderate height, and the descent to the

Opinion of the Court.

river was quite inconsiderable. It was not at all impossible to surmount the bank, or to descend to the river's edge, where the width between the water and the foot of the railroad embankment varied from ten feet to one hundred feet, according to some of the testimony.

Hugh Brown, a witness for the plaintiff, who was present and saw Ham put off, testified in chief: " Q. From below the bridge two or three rods, clear up to bridge No. 9, state to the jury whether there is any passable ground or way for one to travel outside of the track. What I mean is, what is the shape of the ground? A. It is quite uneven. Q. Is that between the bridges, beginning where he was put off? A. It is quite uneven ground, and bushy, and tree-tops, etc. . . . . Q. On the right-hand side, what is in the way of a man going off from the track, and traveling there? A. Well, there is uneven ground between the railroad and the river, and some rocks and steep pitches between the railroad and the river. Q. Does the river run close to the track? A. It varies from ten to twenty and one hundred feet. Sometimes it is nearer the railroad than others. Q. How was it on the other side, within five or six rods of that bridge? A. Why, this railroad was made along a side hill. Any of the gentlemen here can imagine what kind of a side-cut a railroad will leave after it is made along a side hill. Sometimes there is not much of a cut at all, and then again there is quite a heavy bank. Q. How is it below the bridge, there? A. There is a little ways of it, if I remember right, is quite flat, and then there is a heavy side-cut near by that." The same witness, on cross-examination, said he had, about eighteen months before he was examined, walked down from No. 8 bridge to below No. 10 bridge, looking for a logging party, and walked partly on the railroad track and partly along the creek. He said he did not cross No. 10 bridge, and he thought he did not cross No. 9 bridge. He came out on the track a short distance below No. 10 bridge. He was asked: " Q. Did you follow the railroad track down between No. 9 and No. 10 bridge, coming down? A. No, sir; I kept in where I expected to find this party that I was looking for, in the lumber woods. I knew I couldn't find him if I went in on the railroad. . . . . Q. How close to No. 10 bridge did you come on to the track? A. Why, somewhere about a quarter of a mile

below, I should think.   Q. Was it above the head of the switch to that breaker?   A. Yes, sir." He further testified that, in coming down, he walked on the beach of the river or creek; that the water was low and he could walk on the beach, and that he kept pretty close to the river all the way down.

This was the plaintiff's witness, and he was not contradicted by any one as to this subject.   He proved that it was possible to walk all the way from below No. 10 bridge to above No. 9 bridge, without walking on the track, except for a part of the distance which he did not state, nor did he say it was necessary to walk there at all.   Now, this is the space over the whole of which Ham. and Jones walked on the track till they reached No. 9 bridge, where Ham was killed.   In view of this testimony, it cannot possibly be said that these persons were compelled to walk on the track.   There was no proof that the river was high at that time, or that a person could not walk along it.   It was rough and stony, doubtless, and perhaps some trees and brush would be met with, but there is no evidence that it was impassable.   Walking on the track was more convenient, because it was unobstructed; but that is no justification for a continued trespass upon it for four or five thousand feet of its length. But, aside from all this, there was no proof that the parties could not have walked alongside the track in the space between the side of the track and the bank.   As the burden of proof was upon the plaintiff to show that Ham and Jones were compelled to walk on the track, it was incumbent upon the plaintiff to show that they could not have walked outside the track in the space immediately next the cross-ties.   On all railroads there is more or less of such space, except in crossing over trestles or bridges.

The plaintiff's witness Brown, having testified in chief that there was a retaining-wall in front of the breaker eight or ten feet high, and that there was a switch track leading from the breaker to the main track, was asked, on cross-examination: " Q. Don't you know the fact that it slopes down to nothing, so that there is no wall at the upper end?   A. Yes, sir. Q. There would be no difficulty in a man going right up along that wall from the track to the breaker?   A. When he got to the end of the wall; no, sir.   Q. How far above the end of the wall is the breaker?   A. I don't know. . . . . . Q. The switch

runs right along this wall, doesn't it,—right to the breaker?
A. Yes, sir. Q. And this retaining-wall was to hold up this
switch track? A. Yes, sir. Q. And this switch track runs
right into the main track, just above? A. Yes, sir. Q. And
there is no difficulty in following that switch up to the
breaker? A. No; he can go up the main line until he gets to
the switch." Other testimony to the same effect was given by
the defendant.

As to the small piece of road marked " Old Road " on the
map, and extending from the railroad track to the road leading
past the breaker to Forest City, there was quite a good deal of
testimony, only a small part of which needs reference. George
T. Fletcher, a butcher who had traveled a great deal over the
old public road from Carbondale past the breaker to Forest City,
and had served meat to the persons living in the houses along
that road, on both sides of the breaker, was asked: " Q. Do
you know of a road crossing from No. 3 across the railroad
to No. 4? A. I know there is an old road here that goes down
as far as the railroad, but how much farther it goes I don't
know, for I never traveled along that road, but I know it is
there ; and also there is a footpath for man or beast to go down
this way, but I don't see it on the map. It is from No. 3 to
the bridge. I have walked down there dozens and dozens of
times to the bridge, and walked across the bridge to another
little shanty, and carried meat." John B. Golden, a witness,
for the defence, said : " I have traveled from the railroad there
up this road from No. 4 to No. 1, and up to Hollenbach's
switch, and there is a road—Mr. Hollenbach and I made a
road—out into this old road, and that road comes to Forest
City, or to Carbondale, I should say. . . . . From No. 4 I have
traveled up here a number of times." The surveyor, Frick,
said: " Here is an old abandoned road marked ' Old Road;'
that is abandoned, but, when I was surveying there, there were
people hauling coal up this way, and going up into the main
road. Q. Did you see that old road, and travel down as far
as you have marked it on the map? A. I did. Q. When?
A. The date of the survey. . . . . Q. And you have put on
the map an old road, as if it crossed the railroad? A. It
did. . . . . Q. Did it extend beyond that railroad on this
side? A. Yes, sir. Q. Did you go up to the end of it?

Opinion of the Court.

A. No, sir; I didn't.  I went farther than it is marked there; it extended down along the river, and I didn't follow it all the way down then. . . . .  Q. At this point, what did you find upon the ground crossing the track; what did you find upon the ground where this is marked, 'Old Road?'  A. I found an old road-bed.  The road is not traveled now because the culm dump from the breaker shuts it off.  Q. State what you found there.  A. I found this old road.  It is not traveled very much now.  It is grown up with grass, showing that it is not traveled much.  But there is grading showing that this had been an old road."

Now, the theory of the plaintiff was that Ham was put off at a point quite near No. 10 bridge, and that would be between this old road and the bridge.  The theory of the defendant was that he was put off down near the breaker, and this was testified to by eight or nine witnesses.  If that were the fact, Ham and Jones must necessarily have passed directly by both the end of the switch coming from the breaker to the main track, and the "old road" leading up to the old public road from the breaker to Forest City.  By either of these modes, they could very easily have reached the old public road.  Jones testified that they looked for a road or path out from the railroad, but did not find any.  But a number of witnesses testified that, standing in the road at the bridge or very near to it, the old public road was plainly visible for a considerable distance.  Frick was asked: "Q. When you got to the upper end of that wall, standing at the upper end of that wall beyond it, could you see any road?  A. Yes, sir.  Q. You could?  A. Yes, sir.  Q. On the hill-side?  A. Yes, sir.  Q. How far up?  A. You could trace the road from above the buildings all the way up.  Q. I am asking you about standing on the track?  A. Standing on the track at the upper end of the retaining-wall.  Q. Now, let us go up several hundred rods farther.  Suppose you begin within three or four rods, at that point in bridge No. 10, could you see the breaker?  A. Yes, sir.  Q. You could see the breaker, could you?  A. Yes, sir.  Q. From within two or three rods?  A. Yes, sir. . . . .  Q. Did you stand there to look at it?  A. I have quite frequently. . . . .  Q. From that bridge can you see the road?  A. Yes, sir.  Q. What road can you see?  A. This road,

(illustrating.)   Q. Standing upon that bridge?   A. Yes, sir.
Q. See that that is a road?   A. Yes, sir. . . . . Q. By stand-
ing in that bridge, you say any one can see it?   A. Yes, sir; it
is about fifteen feet above the level of the track, and, of course,
they can see a defined road running there.   Q. Did you try to
see?   A. Yes, sir; I noticed that road.   Q. Standing on those
tracks?   A. Yes, sir.   Q. You went there to see whether you
could?   A. Yes, sir." Frick also testified that he had meas-
ured the whole distance from the breaker to Bridge No. 10,
and it was fifteen hundred feet.   The switch extends from the
breaker towards the bridge for a large part of this distance to
the point where it joins the main track, and beyond that is the
" old road" crossing.   But a small part of the fifteen hundred
feet is left from the end of the switch to the bridge, so that a
search of two or three minutes in that direction would have
disclosed both the switch and the " old road; " or, if Frick's
testimony was correct, the old public road, slightly elevated
above the track, would have been discovered by a mere look
in that direction.   The witness Golden testified that several
of the houses along the road could be seen from above No. 4,
and the road could be seen by a person standing on the track
three rods from bridge No. 10.   The witness Wallace said he
knew the old public road, and at bridge No. 10 there was a
wagon road up to it, and that the houses along the road could
be seen from the bridge.   The witness Fletcher was asked:
" Q. Is the road visible from the point between bridge No. 10
and station No. 4?   Is that road visible from the track?
A. Yes, sir; it is.   There, at No. 3, it is perfectly visible, and
you can see it as plain as can be. . . . . Q. Did you ever stand
down on that track where the switch begins, and look up to
see if you could see the road-bed?   A. I never was asked.
Q. But did you do it?   A. I have done it scores of times. . . .
Q. When did you ever stand within two or three rods of the
bridge, and look up to see if you could see the road-bed of the
old track?   A. I can't give you any dates, but I have done it
dozens of times.   I stood there, and looked up and saw my
team, and could see the road exactly from there." W. G.
Parke testified to the same effect.

From this brief review of portions of the testimony, it is per-
fectly manifest that there was an abundance of evidence to

justify the hypothetical points of the defendant Nos. 7, 8, and 11, and the defendant was entitled to have a direct answer to these points.

It is equally certain that they should have been affirmed just as they were presented. For, it is not possible that, when a person is ejected from a train, he is at liberty to walk upon the track of the road for any considerable distance, or for any distance more than is absolutely necessary to enable him to reach a position of safety. Ham was ejected in broad daylight, between three and four o'clock in the afternoon. A companion was with him, and they had every opportunity to search for a place of egress from the road. There were at least two such places close by where Ham was put off, according to the plaintiff's theory, and immediately on the line of their course, according to the defendant's theory. But the other proof in the case would not justify them in continuing on the track, because it does not establish a really impassable means of departure from the track. It is not at all necessary that there should be a public road in good traveling condition for men and teams, in order to excuse the party from the duty of leaving the track. These men were on foot, and any means of egress from the track, which should be made use of by a person of ordinary prudence for that purpose, it was their clear legal duty to adopt, and a disregard of that duty would be contributory negligence on their part. It seems incredible that, in a distance of four thousand feet, there was no available means of departure from the track under the testimony as we find it in this case. The most serious obstacle seems to be no more than an embankment from ten to twenty feet in height, and that not continuously, and above that such obstructions as stumps, trees, stones, and some underbrush. These are very common conditions in the country, certainly not regarded as serious obstacles by hunters, lumbermen, fishermen, and many others. The fifth assignment of error is sustained.

The sixth assignment is also sustained. The seventeenth point of the defendant was based upon the hypothesis that, if Ham was put off at a place from which he could by ordinary prudence have discovered and gone upon a traveled road, his duty to leave the track would not have been excused by a condition of partial intoxication or the influence of Jones. This

is certainly sound in a legal sense, and should have been affirmed.

We think the defendant's fourth point was entitled to an affirmance, for the reason that, although the defendant company may have been bound to carry the passenger on a ticket sold by another company, the conductor was entitled to have proof of that fact by seeing the ticket. But we cannot see any reason why the conductor would be justified in treating the passenger as a trespasser, if the evidence is believed that the full fare was tendered to him before the passenger was ejected. That testimony was denied by the defendant, but it was an open question for the jury, and in the general charge the learned court below correctly stated the law to the jury upon this subject. Technically, the first assignment must be sustained, as the point contained the ingredient of a refusal by Ham to pay the fare.

The second assignment is not sustained, because the plaintiff's first point was strictly correct. The passenger would not be a trespasser, merely because he could not find his ticket, and his act of entering the car in the contingency stated in the point would be perfectly legitimate. It would only be by a refusal to pay his fare when he could not produce his ticket, that he would become liable to be treated as a trespasser.

The third and fourth assignments are not sustained. If an actual tender of fare was made before the train was stopped, the conductor could not refuse it, no matter who made the tender.

The seventh assignment is not sustained.

> The judgment is reversed, and new venire awarded.