# Ham v. Delaware & Hudson Canal Co., Appellants.

*Negligence—Railroads—Ejection of passenger—Evidence.*

It is the duty of a passenger who is wrongfully ejected from a train and placed upon the track, to leave the track at the earliest practicable opportunity that a reasonably prudent man would discover and seize upon, and the burden of proof that he did so is upon him.

A passenger was wrongfully ejected from a train at a point in an apparent wilderness, and where the only possible way out seemed to be along the railroad tracks. The passenger was ignorant of the surrounding country, and knowing of no opening by which he could get off the track, and upon a traveled road, he took the track upon which he would face approaching trains, and followed it until he came to a bridge, and in crossing the bridge was struck by a locomotive and killed. The evidence as to the distance the passenger walked varied, but the lowest estimate placed it at about half a mile. There was evidence on behalf of defendant that there was a traveled road which could easily be seen from the point where the deceased was put off the track. It was held that the case was for the jury. Mr. JUSTICE GREEN dissented on the ground that the presence of the passenger at so remote a point could not be justified except upon a clear proof of a most imperious necessity.

*Evidence—View of ground by jury.*

Where a jury has viewed the scene of an accident, it is not improper for the court to say in the charge that the jury have the aid of their own observations " to supplement the testimony of the witnesses."

Argued March 8, 1892. Reargued March 13, 1893. Appeal, No. 238, Jan. T., 1892, by defendant, from judgment of C. P. Susquehanna Co., Jan. T., 1889, No. 206, on verdict for plaintiff, Matilda Ham. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Trespass by widow for death of her husband caused by alleged negligence of defendant.

At the trial, before SEARLE, P. J., it appeared that plaintiff's intestate, James Ham, on Nov. 3, 1888, was a passenger upon a train of defendant company from Carbondale to Forest City. When the conductor approached him for his ticket, Ham informed him that he had purchased one that morning, and began searching his pockets to find it, but failed to produce it. There was evidence that Ham's step-daughter offered to pay the fare, but that the conductor, notwithstanding the tender, ejected

Ham from the train. Evidence on behalf of the company tended to show that the tender of the fare did not include the ten cents extra, which was charged when fare was paid on the car.

Evidence on behalf of plaintiff tended to show that Ham walked along the railroad from the point where he was ejected, and on the track upon which he would face approaching trains, for a distance of about half a mile, and in crossing a bridge was struck by an engine and killed. From plaintiff's evidence it appeared that the place where Ham was put off was about half way between Carbondale and Forest City, and a few rods from a bridge across the Lackawanna river, called bridge No. 10; that at this point the country appeared, from the track where Ham was left, to be a wilderness; that no houses were in sight, and no sign of any traveled road; that the timber trees of the forest were cut down, leaving tops, and partially grown up by brush; that no cleared fields were in sight, and apparently no possible way out, except by following the railroad track; that at the actual place where Ham found himself when the train left him, there was a steep bank caused by a side cut made in excavating for the railroad on one side, from ten to fifteen feet high, and on the other, a bank down to the river; that Ham was ignorant of the surrounding country, and had no way of getting out except by following the railroad; that from that point to the bridge where he received the injuries from which he died, there appeared no opening by which he could get off the track and upon a traveled road. That at the point where the engine struck him, on the bridge called No. 9, the track, upon leaving the bridge at its northern extremity, made a sharp curve and entered a cut, so that one standing upon the bridge could see an approaching engine but a short distance away.

Evidence on behalf of defendant was to the effect that deceased was put off the train near a coal-breaker; that there were other houses in sight, and a reasonably easy and safe way to immediately leave the railroad track and reach a traveled road, which ran but a short distance away from the track and nearly parallel with it from the place where Ham was put off to beyond where he received the injury. That the traveled road and those houses were easily to be perceived from nearly the whole distance traveled by Ham after he was ejected from the train.

Much of the testimony is quoted in the dissenting opinion of Mr. Justice GREEN.

Defendant's points were among others as follows:

"1. That the presence of James Ham upon the track at bridge No. 9, where the accident happened could only be justified by a most imperious necessity, and there is no sufficient proof of any such necessity in this case." *Answer:* Refused. [1]

"3. There is no sufficient evidence in this case that James Ham was compelled to walk upon the track from the point where he was ejected to bridge No. 9 where he met with the injury." *Answer:* Refused. [2]

"4. That under all the evidence in the case the plaintiff is not entitled to recover." Refused. [3]

"5. That when James Ham came to bridge No. 10 where there was no way to pass over except by walking upon the ties upon which the rails of the track were laid, it was his duty to stop and turn back and make such diligent search as a prudent man would have done, for some way off the track, and if such diligent search would have shown him an old road at No. 4 leading to the Forest City road or to the switches leading to the breaker where about one hundred men and boys were at work and where he could have found a road indexed with telephone poles and wires leading all the way to Forest City, then if he failed to do this and leave the track he was guilty of contributory negligence and the plaintiff cannot recover. *Answer:* Affirmed, with the qualification that if the stopping and turning back from the bridge to look for a place of egress would have been the action which a man of ordinary care and prudence would have adopted under the other circumstances detailed in the point, then a failure on the part of Ham to turn back and look for a place of egress was contributory negligence." [4]

Plaintiff's points were among others as follows:

"7. If Ham was put off on the railroad track and left on the track where it was not a reasonably safe place, and he continued to follow the track to bridge No. 9, and, using reasonable diligence, discovered no highway between the point where he was put off the car and bridge No. 9 which a prudent man would have discovered, and was not guilty of any contributory negligence, then he was not a trespasser in following the track

upon which the defendant had placed him to that point, and this is for the jury to determine." Affirmed. [5]

"12. If James Ham was put off the cars on Nov. 3, 1888, at a point between the North West breaker and bridge No. 10, and although he might have gone up to the breaker and by inquiry found a way out to his home, or found any other place before he arrived at bridge No. 9 by which he could have reached his destination; yet if a man by the exercise of ordinary care and prudence would not have done so but would have walked on the track as James Ham did by reason of the apparent impassibility of a way out and was killed by an engine which the conductor should have foreseen would be the natural and probable consequence of leaving James Ham in the place and at the time he did, and James Ham was not guilty of contributory negligence, then the plaintiff is entitled to recover in this action." Affirmed. [6]

"13. All the care that was required of James Ham, after being put off the car, is simply the ordinary care and diligence of a reasonably prudent man under the circumstances." Affirmed. [7]

"15. Even if Ham, at the place where he was put off, could have seen the breaker, the law did not require that he should go to the breaker to find his way out, unless they find that a prudent man, exercising ordinary care would have taken such a course. And if they find as a fact that in order to reach the breaker, he would have been required to travel a long distance upon the railroad tracks, and cross a number of switches upon which cars were being run out from the breaker, this fact is to be considered by them in ascertaining whether an ordinarily prudent man would have taken such course, and the jury must consider all the evidence as to the condition of the roads leading out from the breaker. *Answer:* This point is affirmed. The jury should take into consideration all the circumstances as they find them from the evidence, in order to ascertain whether an ordinarily prudent man would, or would not have gone that way." [8]

The court charged in part as follows:

" [You have not only heard all the testimony given in the case, but nine of your number have been upon the ground where Ham was ejected from the cars, and from which he pass

ed to where the accident occurred, and have the aid of your own observations to supplement the testimony of the witnesses. The questions as to the character of the place where Ham was ejected from the cars, whether dangerous or not, whether the putting him off the cars was the approximate cause of the injury resulting in his death, and whether Ham was guilty of contributory negligence or not, are all questions of fact for you to determine under the instructions we have given you."] [9]·

Verdict and judgment for plaintiff for $8,412.50.   Defendant appealed.

*Errors assigned* were (1–9), instructions, quoting them.

*W. H. Jessup, H. C. Jessup* with him, for appellant, cited. Graham v. P. R. R., 139 Pa. 149; Mulherrin v. R. R. 81 Pa. 366; R. R. v. Hummell, 44 Pa. 375; R. R. v. Schwindling, 101 Pa. 258; R. R. v. Collins, 87 Pa. 405; Hoffman v. R. R., 48 Leg. Int. 539; Flower v. R. R., 132 Pa. 524.

*E. L. Blakeslee* and *A. B. Smith, Jr.*, for appellee, cited: Lake Shore & Michigan Southern Ry. v. Rosenzweig, 113 Pa. 520; Sherman and Redfield on Negligence, 2nd ed. 333; 2 Wood's R. R. Law, 1409; 37 A. & E. R. R. Cas. 87; Kreuziger v. R. R., 40 North Western Rep. 657; Evans v. St. Louis etc. Ry. Co., 11 Mo. Ap. 473; P. R. R. v. Ogier, 35 Pa. 70; Reeves v. D. L. & W. R. R., 30 Pa. 454; P. R. R. v. Zebe, 33 Pa. 318; P. R. R. v. Werner, 89 Pa. 59; Aiken v. R. R., 130 Pa. 380; Sioux City & Pac. R. R. v. Stout, 84 U. S. 657; Fritsch v. Allegheny, 91 Pa. 228.

OPINION BY MR. JUSTICE MITCHELL, May 25, 1893:

It must be accepted as settled by the evidence and the verdict that James Ham was wrongfully ejected from the car, and did not enter on the track as a trespasser or by his own fault. Cases therefore like Mulherrin v. R. R. Co., 81 Pa. 366, and R. R. Co. v. Collins, 87 Pa. 405, and others which hold that a man who steps his foot on a railroad track except at a public crossing does so at his own peril, and that it is negligence per se, have no application.

The substantial controversy in this case is upon the standard of conduct required of a man who like Ham is wrongfully put on a railroad track, as to the time and manner of getting off. The learned judge below told the jury concisely in affirming the plaintiff's thirteenth point, that " all the care that was required of Ham after being put off the car, was simply the ordinary care and diligence of a reasonably prudent man under the circumstances; " and again in affirming the defendant's twenty-second point, that " when Ham was placed upon the track it was his duty to leave the same at the earliest practical (practicable) moment, and if he did not do so, he was guilty of contributory negligence." This instruction was repeated and reiterated with varied illustrations from the proved or hypothetical facts in evidence, in the general charge and in the answers to five points by the plaintiff and fourteen by the defendant on this branch of the case alone, but the standard prescribed, to wit, that Ham should have got off the track at the earliest practicable opportunity that a reasonably prudent man would have discovered and seized, and that the plaintiff had the burden of proof that Ham did so, was not varied, and unless this was an erroneous standard the judgment must be sustained.

That this was the proper rule for the guidance of the jury does not admit of question. Ham as already noted was put in a place of danger without fault of his own ; he was bound to use care, diligence and judgment to get out at the first opportunity ; but using these he was not chargeable with responsibility for the result, and the standard of the care, diligence and judgment he was bound to use, was the common standard of the ordinary prudent and careful man.

This was the rule which was claimed by the appellant when the case was here before, and which we then said was applicable. Ham v. Canal Co., 142 Pa. 617. But a single expression in the opinion has led the appellant to claim now that nothing short of " imperious necessity " will excuse Ham for continuing on the track. In that case certain points were presented by the defendant, based on hypothetical statements of the facts which if true entitled the points to an affirmance. Our brother GREEN reviewed the evidence, and in doing so used the expression that whether the distance from where Ham was put off the car to where he was struck was four thousand feet as claimed by plain-

tiff, or a mile as claimed by defendant, " the presence of the men on the track at so remote a point cannot be justified except on clear proof of a most imperious necessity. Of that kind of proof we can discover none in this case." This was meant to show how the hypothetical points of defendant were supported by the evidence, and the character of evidence that should be satisfactory to the jury in connection with such points, not to take the case away from the jury or to set up a different standard for their guidance than the points contained. This is expressly stated in the opinion itself (p. 633–4). " From this brief review of portions of the testimony it is perfectly manifest that there was an abundance of evidence to justify the hypothetical points of the defendant, Nos. 7, 8 and 11, and the defendant was entitled to have a direct answer to these points." The standard that the points themselves set up (p. 622) is " the conduct of a reasonably prudent man " or an " ordinarily prudent man," and this was what the court held should have been affirmed. This standard is the same at all times, but the degree of care that it implies will of course vary with the circumstances of each case. In the presence of great or imminent danger, more care would be exercised by a prudent man than where the risk was less, his prudence and care are sharpened by the exigencies of the situation. Therefore more care is required of the plaintiff who must conform to that standard. In the present case Ham's continuance on the track was fraught with continued danger, and when he came to the bridge the danger was still further increased. He was bound therefore to consider the situation with attention wide awake to its perils, and to take another way out of them, even though less direct and less convenient, if such other way was presented which would commend itself to a man of reasonable and ordinary prudence. But this, after all, is the standard to which we must continually return. It is the true standard which the law establishes for judging the conduct of men in the daily affairs of life, and no other was intended to be set up in the decision when this case was here before. The phrase "imperious necessity " used in the opinion was a very graphic and forcible expression of the necessity of care, but it was not intended to set up any other measure than that of a prudent man, alive to the dangers of the course he pursues, who nevertheless chooses it as the best

of the alternatives open to him. It was used with regard to the character of the evidence that should be satisfactory to the jury, in taking the view that a prudent man would under the circumstances have risked continuing on the track for such a distance, and crossing the bridge. That it was not meant to set up a different standard of care as matter of law, is clear from the granting of a new venire, though the court could discover no proof of the kind described. That was for the jury.

We see no benefit in a detailed review of the evidence. It is mainly the same as when the case was here before, though somewhat strengthened for the plaintiff. There was much testimony as to the feasibility of getting off the track at various points and without crossing the bridge where the accident happened, and the jury might well have so found. But there was also much testimony to the contrary, and the preponderance was not so great and the result so one-sided that the court could have pronounced it as a matter of law. Whether a safe road was there or not was only a part of the question. There still remained whether Ham, with ordinary diligence and prudence could have seen it, and seeing ought to have taken it. A man familiar with a locality may take an uninviting path, knowing it will lead him aright, while a careful man not knowing how it may turn out, nor even whither it may lead, may well be exonerated from negligence in not making the experiment, though it would in fact have been the best thing to do. The elements of prudent conduct on the part of Ham were too many and too varied to be determined except by the jury, and the rule laid down for the jury's guidance was in accordance with the settled law. If they have made a mistake in its application the remedy is not with us.

Nor do we find any error in the reference to the view of the ground by some of the jurors. They were told that they had the aid of their own observations " to supplement the testimony of the witnesses." This was not substituting their eyes exclusively for the evidence in the case, but using them as an aid in weighing and applying it. Though not so explicit and full as the charge in Flower v. R. R. Co., 132 Pa. 524, it was in substantial accordance with it.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE GREEN.

When this case was here before, 142 Pa. 617, we said, " that the presence of the man on the track at so remote a point cannot be justified except upon clear proof of a most imperious necessity : " and also that, "It is not possible that when a person is ejected from a train he is at liberty to walk upon the track of the road for any considerable distance, or for any distance more than is absolutely necessary to enable him to reach a position of safety."

We also held that there was no proof of that kind of necessity in the case and reversed the judgment of the court below chiefly on that ground. On the last trial of the case in the court below the defendant submitted a point in the following words, viz : " That the presence of James Ham upon the track at Bridge No. 9, where the accident happened, could only be justified by a most imperious necessity, and there is no sufficient proof of any such necessity in this case." To this point the learned court below made answer as follows, " That point is refused."

The defendant's third point was, " That there is no sufficient evidence in this case that James Ham was compelled to walk upon the track from the point where he was ejected to Bridge No. 9 where he met with the injury." This point was also refused.

In charging the jury and answering the points submitted on both sides the court below entirely ignored the rule of duty as we declared it, and announced another and very different rule, to wit, that the deceased was only bound to exercise ordinary care and prudence, and if a person of ordinary care and prudence would have walked on the track as Ham did, and was killed by an approaching engine, he was not guilty of contributory negligence, and the plaintiff would be entitled to recover. The thirteenth point of the plaintiff was in the following words, " All the care that was required of James Ham after being put off the car, is simply the ordinary care and diligence of a reasonably prudent man under the circumstances." This point was affirmed without qualification.

Passing by the question of good or bad grace of the lower court in refusing to obey the ruling of its superior, it is very evident that both of these rules of duty cannot be correct.

This court declared that the ejected passenger had no legal right to remain upon the track except as compelled by an imperious, or absolute necessity. The court below charged that he had a legal right to remain on the track as long as a person of ordinary prudence would do so, and that this measure of ordinary prudence must necessarily be determined by a jury. What an ordinarily prudent man would do could only be determined by a jury, and therefore the test of the legal right must always be adjudged by the uncertain and fluctuating verdict of a jury. According to the rule established by our former decision the test would be the presence or the absence of an absolute necessity, and whether there was any sufficient proof of such a necessity would be a subject of proof which the court could determine. The latter is a legal rule, the former is no rule at all, because what one jury might regard as ordinary prudence another jury might regard as no prudence whatever.

But abstractly, on the intrinsic merits of the question, how can it be contended that because a man has been wrongfully ejected from a train, he is at liberty to take possession of a railroad track and to walk upon it for an indefinite distance and an indefinite time to be determined by the caprice, whim or prejudice of an irresponsible jury. If such a right exists, the right of the railroad company to occupy its tracks with its traffic must be suspended until the right of the ejected passenger ceases, which no man can tell under the rule of ordinary prudence. For there cannot be two conflicting legal rights to the occupancy of a railroad track at the same time and place. If one exists the other does not, because it cannot, and all the business of the road must be stopped at the point in question while the superior legal right of the ejected passenger is being exercised. If the ejected passenger has the right to walk upon the track between the rails for half a mile, or a mile, or any number of miles that a jury might be willing to say an ordinarily prudent man would have walked, it is manifest that the railroad company has no legal right to run its cars on the same track at the same time. In no case that we have been referred to, and in no text book, has such a doctrine ever been asserted, nor do we conceive it ever will be.

There are cases of course where a passenger has been wrong-

fully ejected in which he has been justified in a temporary occupancy of the track while endeavoring to reach a place of safety. But they are all exceptional and are based upon the special circumstances of the situation. Thus in the citation from 2d Wood's R. R. Law, 1409, quoted in appellee's argument, the passenger was put off in a cut twenty feet deep and was making his way out when he was run over and killed. Also in the case of Evans v. St. Louis etc. Railway Co., 11 Missouri Appeal, 473, the passenger was put off at midnight in a wintry storm, and while attempting to go to the next station, fell through a cattle guard and was injured, it was held there could be a recovery on the ground of wanton, reckless and oppressive conduct in ejecting the passenger in such circumstances. The same is true in the case cited from 40 North West. Rep. 657, Kreuziger v. Chic. & N. W. R. R. Co. The case cited from 37 Am. & Eng. R. R. Cases, page 87, is of the same character, and the gravamen of the plaintiff's case was that the railroad company instead of stopping at the regular station to let off the passenger, carried her past that point, and then refused to back down to the station to let her off, but compelled her to alight at a point some distance from the station, and while attempting to reach the station, she fell through a cattle guard and was hurt. In that case there was an embankment on one side of the track with a ditch at the bottom of it, and on the other side was a train of standing cars, and no assistance was offered to the passenger to alight and reach the platform.

But in this case there were no such circumstances, nor any other circumstances of an exceptional character, which rendered it necessary or desirable, or prudent, for Ham to occupy the track and walk between the rails over the entire space between the point of ejection and on the bridge where he was killed. In the former opinion the evidence was fully and patiently reviewed showing the various means of egress from the railroad by which Ham and his companion Jones could have left the track. It is not necessary to repeat them here. But there was another and more apparent, and immediately available, means of avoiding the track, which was not then discussed. Attention had not been called to it on the argument, but since the present argument it has become more conspicuous, and while it has not been developed in the testimony to any thing like the

extent it might have been, there is yet enough of the testimony on the record to establish it with conclusive force. The railroad upon which the defendant's cars were running was a double track railroad. The witness, Walter Frick, an engineer, made a survey of the ground and a map which was given in evidence showing the location of the road, the colliery, the bridges, the creek and other parts of the immediately adjacent territory. Having testified that the map was made from a scale which he gave, he was asked: "Q. What does it represent; what does it represent generally? A. Well, it shows the main tracks of the New York, Lake Erie and Western Railroad Company, and the branch tracks running into the North West Breaker, the road running parallel to the tracks to bridge 9, etc. . . . . Q. Are the railroads marked on that map correctly laid down as you found them from measurements? A. Yes, sir."

The main, and by far the most important, witness for the plaintiff, Thomas Jones, who, when Ham was ejected, got off the car and joined him and walked all the way with him on the roadbed and on the bridge where he was killed, gave most direct and important testimony on this subject. I quote the following: "Q. Ham stood about thirty feet from you when you landed? A. Thirty or forty feet. Q. Was he walking on the track? A. He was walking between the two tracks I believe. . . . Q. Did you go back to him? A. I said a moment ago that I did not. Q. Did he come up to you? A. Yes, sir. Q. Then what did you do? A. We staid and considered what to do and we thought it was just about as near for us to go to Forest City as to go back. . . . Q. And didn't you and Ham then start following up the train? A. We started towards Forest City. Q. Didn't you follow the train right up as soon as you started? A. We couldn't follow the train. The train was quicker than we. We followed the same way *but on a different track.* Q. You followed the train? A. We followed the train on another track. *We went on the down track.* . . . Q. If you had gone back and found a place to go up you could have gone on the road to Forest City? A. Gone back where? Q. Gone back anywhere? A. I don't know. I didn't go back. We were just about half way and we thought it was just about as quick to go to Forest City as to go to Carbondale."

Describing what took place on No. 9 Bridge, he was **asked**:

" Q. What did you jump for? A. I jumped to save myself and tried to jump on the other track but I went down." Having stated that the engine struck Ham on the bridge he was asked : " Q. Where did it knock him ? A. Right in the breast first and it knocked him right down under the bridge into the river. Q. Between these two tracks where you went. A. Yes, sir."

He was also asked : " Q. When you first got off what was said as to which way you would take to get off ? A. I didn't know anything about the road and I thought it would be as near to go to Forest City as to go to Carbondale."

In describing his jump on the bridge he was asked : " Q. You jumped on to the tie ? A. I jumped and I struck the tie and I couldn't steady myself there and I went down. That is the way I have told it all the while. Q. How far was it that you jumped ? A. I couldn't tell you how far. I said it was from seven to eight feet high, I never measured it. Q. How far across ? A. Well you can say what distance it is between the up track and the down track as well as I can."

The testimony of Thomas Jones was exactly the same on the second trial as on the first. He was not examined on the second trial, but the notes of his testimony on the first trial were read in evidence. Now his testimony establishes conclusively, so far as the plaintiff's case is concerned, several matters of the greatest consequence in this connection. (1) That he and Ham went voluntarily upon the railroad towards Forest City instead of back to Carbondale, it was only a question of convenience. (2) That while they were going foward from the time they started they walked upon one of the tracks. (3) That the track they walked on was not the one the train moved on but the other one, the down track. That is, they walked directly towards trains approaching them in their front, and consequently had merely to look directly before them for the only trains which could harm them. (4) The deceased James Ham left the space between the tracks where he would have been safe and entered upon the space between the rails on the down track and continued there until, (5) he was struck on the bridge on the same track.

All of these facts are conclusively established against the plaintiff by her own witnesses and are therefore to be treated

as undisputed. The question then arises: Is it possible to justify the position of James Ham at the time he was killed upon any principle known to the law which has been recognized by this court?

It certainly was not *necessary* for him to be there in any conceivable point of view. It was broad daylight, four o'clock in the afternoon, on the third day of November. It was not storming, and there was absolutely nothing to prevent his deliberate choice of at least the safest mode of proceeding along the track if he did not choose to depart from it altogether. Instead of doing that he chose the most dangerous path and place that was possible.

Had he remained in the space between the tracks where he was when he started he would presumably have been perfectly safe. The exact distance between the tracks does not appear in the testimony, but, as the writer understands, the regulation distance between the tracks of a double-track railroad is seven feet, and there is no testimony to show that these tracks were any closer. The witness Jones says that on the bridge where he jumped it was the distance between the up track and the down track, showing that the two tracks were as far apart there as on the roadbed beyond the bridge.

Nor can Ham's choice of his route be defended upon the ground of reasonable prudence. If any trains were moving he was certain to encounter them upon the track he chose. Had he chosen the other track he would not, and could not, have met with the accident which destroyed his life. But it is preposterous to say that having a choice between an open pathway between the two tracks, up to, and on, the bridge, and the space between the rails of the track upon which he walked, he was reasonably prudent in choosing the latter. Why should he walk on the track? Why should he walk on the narrow space between the rails and on the cross ties, in the very throat of manifest danger, when there was a wider space with no cross ties and no rails and no possible approaching engine from before or behind, lying right beside him? When he was on the bridge, where he had no right to be in any conceivable view of the case, he was obliged to walk on the timbers of the bridge whether he was between the rails of the track or outside of them. Why then should he walk on the track between the rails? Why not

cross the bridge on the same timbers but outside the rails? To attempt to cross that bridge on the track between the rails was certainly not necessary, as all the rest of the bridge and another track were there, and it is equally certain it was not reasonable prudence. Nor have we any right to shelter ourselves behind the verdict of a jury which practically says it was reasonable prudence. If we do this we found a judicial decree upon what we know to be an absolute falsehood, and I will be no party to such a judgment. The writer saw this roadbed and this bridge, in the presence of counsel on both sides, and he walked the whole distance traversed by Ham, crossing the bridge its entire width, and in doing so he never once set foot within the rails of either track, either on or off the bridge. There was not the least occasion to do so. There was ample space not, only between the two tracks but on the outside of both the tracks to walk in perfect safety.

We abandoned the abject slavery to insensate and untruthful verdicts when we declared that, " It is in vain for a man to say that he looked and listened, if in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive." . While this doctrine was first declared in the affirmance of a judgment of nonsuit, Carroll v. Railroad, 12 W. N. 348, we have constantly followed and enforced it in many cases in which verdicts for the plaintiff were founded and defended in this court upon just such testimony : Railroad v. Mooney, 126 Pa. 244 ; Railroad v. Bell, 122 Pa. 58, and many other cases. It is not likely that we will ever return to the thraldom from which we have escaped.

It is to be added that on the trial no testimony was given to show that it was either necessary, or reasonably prudent, for Ham to walk between the rails of the track, either on the roadbed or on the bridge, especially on the down track. There was not a particle of testimony given to show that there was no room for him to walk on the space between the tracks, or on the open spaces outside of both tracks. On the contrary it appeared by the testimony of Jones, the plaintiff's own witness, that there was such space between the tracks, and that there was another track on either of which if Ham had walked he would not have been hurt. In that state of the testimony it is perfectly clear to my mind that either upon the doctrine of neces-

sity, or reasonable prudence, it was the plain duty of the court below to have affirmed the defendant's third and fourth points, and directed a verdict for the defendant.

Thus far I have considered the case chiefly upon its facts. It is now desirable to consider it upon its law. Is the doctrine of reasonable prudence applicable to such a case ? Is it the law that a wrongfully ejected passenger may occupy the track longitudinally, walking between the rails, when it is not absolutely necessary for him to do so ? This court, in this very case, said that it was not, but the court below said it was. We have not been referred to a single case or text-writer's opinion, holding that such was the law. Is the proposition supported by reason or analogous principles ? In my judgment certainly not. If we consider the question analogically we have a most emphatic illustration close at hand, and under constant consideration. It is the perfectly well established law of this commonwealth, that all travelers on highways which are crossed by railroads, have a legal right to occupy the tracks of the railroads for the purpose of crossing them. This is a pure legal right which entitles the traveler to the temporary occupancy of the track. But we have never yet tolerated the proposition that he might go upon the track, if, in the opinion of a jury, a reasonably prudent person would do so. We have never permitted the doctrine of reasonable prudence to prevail to the slightest extent in the exercise of this undoubted legal right of temporary occupancy. On the contrary we have always held that in exercising this right the traveler must first stop, look both ways and listen for approaching trains, before setting foot upon the track, and that if he fails to do this he is guilty of contributory negligence and can not recover. We enforce this doctrine whenever the facts in evidence show that this preliminary duty has not been discharged, without the slightest attention to the verdicts of juries who have disregarded the law and the evidence. In other words, although the right of a traveler on a highway, to go upon the track of a railway for the purpose of crossing it, is an absolute right and therefore quite as high, indeed higher than, the right of a traveler ejected from a train, it can only be exercised subject to strict conditions, the nonobservance of which forfeits all right of recovery for injury or death. In the present case in order that a recovery can be had we must suspend the

rule that one who is upon a railway track, or about to enter upon one, must look and listen for approaching trains. Ham was walking on the track, in the direction from which trains approached towards him, right before his eyes. Must he not look for them? If not, why not? An ordinary traveler in the mere act of crossing must do so and no question of ordinary prudence is permitted to be entertained in adjudging the exercise of the right. Yet here is a man who is not merely crossing, but walking, along and upon a track, for a long distance, and the court below charged the jury that he might do so with impunity if in the opinion of the jury a person of ordinary prudence would do so. No duty of looking, no duty of listening, was asserted by the court; the charge and the answers to points were absolutely devoid of any such conditions, and in their place was substituted a mere meaningless, and utterly worthless test, called ordinary prudence. Upon what principle, or upon what authority, was such an extraordinary departure made from the perfectly well established rules which prevail without question in all other cases? I answer none, absolutely none. What I claim, and what this court decided, is that nothing short of absolute necessity could legally justify such an occupancy. But the court below said no, and refused a point containing that single proposition. How can we possibly approve such a ruling? We cannot do so at all without first stultifying ourselves, for we deliberately and unanimously decided in this very case that nothing but imperious necessity could justify Ham's occupancy of the track at the place where he was killed. Now we say that is not the law, and that he might occupy the track at that place without any necessity imperious or otherwise, but only upon condition that a jury would say that in their opinion a person of ordinary prudence would have done so. What opinion will be entertained of such absurdly inconsistent rulings, by the bench and bar of the commonwealth, it is not at all difficult to foretell. How lawyers are to advise their clients, and how judges are to charge juries, when similar questions come before them hereafter, it is not so easy to know.

In considering the legal aspect of the subject it will be instructive to review some of the very numerous utterances of this court respecting the occupancy of railway tracks by individuals.

So long ago as in 1852, Chief Justice GIBSON, in the case of Railroad v. Skinner, 19 Pa. 298, said : " But high above this stands the impregnable position that a railway company is a purchaser, in consideration of public accommodation and convenience, of the exclusive possession of the ground paid for to the proprietors of it, and of a license to use the greatest attainable rate of speed, with which neither the person nor the property of another may interfere." This was an action to recover damages for running over the plaintiff's cow on a railroad track. The court below correctly charged the jury on the general subject of negligence by each party, and the exclusive right of occupancy of its tracks by the company, but permitted the case to go to the jury in answering the fifth point of the defendant which was in these words : " 5. That the plaintiff by the law of the land, was bound to take care of his own cow, and to keep her off the track and land of the defendant ; and as he failed to do so, without any necessity for such failure, and the cow was killed while on defendant's track, he cannot, under the evidence, recover in this case."

To this point the court below answered as follows : " If the plaintiff knew his cow was wandering on the railroad, it was his duty to drive her therefrom. He had no right to suffer her to be there, and if he did suffer it, knowing her to be there, he was guilty of such negligence as should prevent his recovery. But if his cow casually wandered away, ordinary care being used to restrain her, the simple fact of her being on the track, would not excuse the defendant's negligence." It will thus be seen that in that case as in the present, ordinary care is contrasted with necessity, in the temporary occupancy of the track, but this court utterly scouted the distinction and reversed the judgment, which was of course given for the plaintiff on the verdict, and refused a new venire.

In 1855, in the case of Railroad v. Norton, 24 Pa. 465, the plaintiff, who was in the employ of the Phila. & Read. R. R. Co. sawing wood for them on a contract for that purpose, had, by authority of an agent of the company, fastened his sawing machine to one of the rails of the track, and was injured by the engine of another company which had a right of passage over the track. The company defended upon the allegation of contributory negligence, to which the plaintiff replied by assert-

ing the authority of the Reading company for the temporary occupancy of the track. The court below held this authority to be a sufficient reply to the allegation of contributory negligence, and sent the case to the jury who, as usual, gave a verdict for the plaintiff. But this court refused its sanction in the following emphatic language : " The court ruled that he (plaintiff) was lawfully there. We are obliged to say that he was not. He had the authority of Burns, an agent of the Reading Railroad Company, for whom he was sawing wood ; but it was in clear proof that Burns had no express authority to put him there. And what if he had ? Neither Nicolls, the superintendent, nor the Reading Railroad Company itself, had any right to fix such a nuisance on that track. . . . It is of the utmost moment to human safety that railroad tracks should be kept clear of all manner of obstructions and used only for the purposes for which they were constructed. The employees, whether authorized or not, have no more right than strangers, to pervert them from their original design, and devote them to other than the great public objects which bring them into existence. . . . If therefore a man plants himself on the rail, he must not expect the law to do more for him than to punish wanton injury. If he be injured from the ordinary pursuit of the company's legalized business, let him blame his own rashness and folly."

How much farther this court went in the case just cited than it is at all necessary to go in the present, is manifest at a glance. The plaintiff there was occupying the track for weeks in succession by the direct authority of the company's agent. He was an employee of the company and in no sense could he be treated as a trespasser. Yet his occupancy of the track was denounced by this court in the sternest language as disqualifying him from any right of recovery. That plaintiff *planted himself on the rails,* just as this plaintiff did, but with this difference, that he was distinctly authorized to do so, while this one was not. If the doctrine of reasonable prudence in such occupancy could ever have a lodgment in our jurisprudence in this class of cases, how eminently fitting would have been its application in such a case. In that case, as in this, the counsel for the plaintiff contended in this Court that if the plaintiff conducted himself with ordinary care, although he

was somewhat in fault, he could recover, and that as he was on the track by permission of the company he was not guilty of culpable negligence.    But this contention met with no favor in this court and was altogether rejected.

In Railroad v. Hummel, 44 Pa. 375, we said, STRONG, J.: "It is time it should be understood in this state that the use of a railroad track, cutting or embankment, is exclusive of the public everywhere, except where a way crosses it.    This has more than once been said, and it must be so held not only for the protection of property, but, what is far more important, for the preservation of personal security and even of life."    This was said in a case in which a child was on the track, who was not responsible for contributory negligence.

In the next case to which I refer the facts were so closely analogous to those of the present case, in so far as the occupancy of the track was concerned, that they gave occasion for the application of the very principle for which I contend.    It is Mulherrin v. Del. Lack. & Western R. R. Co., 81 Pa. 366.    The opinion was delivered by Mr. Justice PAXSON, late Chief Justice of this court, and in it he states the facts thus : "The injury was caused by the train of the Delaware, Lackawanna & Western Railroad Company.    The track was owned by the Lackawanna & Bloomsburg Railroad Company.    The former company had the right of trackage over the road by virtue of an agreement between the two companies and the train of the Delaware, Lackawanna & Western Railroad Company was lawfully upon the track.    There are two tracks at the point where the injury occurred.    Between the inside rails of the said tracks there is a space of seven feet in width, leaving a clear space between passing trains of about three and a half feet in width, while outside the southern track there is room to walk without danger.    Patrick Mulherrin, the plaintiff, was in the employment of the Lackawanna & Bloomsburg Company as a brakeman.    On the morning of 29th of June 1871, he was on his train approaching Scranton from a northerly direction; when near Jackson street he got off from his train to turn the switch, and having performed this duty, he went to the watchman's house, near the switch, where he remained some time in conversation with the watchman, then lighted his pipe and started towards Scranton to join his train, walking on the north-

ern track. When he stepped on said track a train was passing him on the southern track. Instead of waiting until the train had passed and then crossing over both tracks to the outside of the southern track, where there was clear space to have, walked with safety, he continued walking on the northern track until he was overtaken by the defendant's train, moving in the same direction, which struck and badly injured him. Upon this state of facts he seeks to recover from the defendant damages for the injuries sustained." The court below had charged the jury that if it were the case of a stranger being upon the track he could not recover, but because the plaintiff was a brakeman he had a right to be upon the track in the performance of his duties, and he left it to the jury to determine whether the plaintiff was guilty of contributory negligence in view of all the evidence "amongst which is the fact that he was a brakeman, and that it was his duty to close the switches near the watch-house, his train moving on meantime, and the further fact that he was seeking to join it when he was struck."

The jury returned a verdict for the plaintiff, and this court reversed the judgment without a venire, holding the above instruction to be erroneous, for the reason that the plaintiff was not necessarily on the track, there being room between the tracks and outside the southern track where he could have walked with safety. Mr. Justice PAXSON, after quoting from Railroad v. Norton, supra, the language cited above, said : "Except at crossings where the public have a right of way, a man who steps his foot upon a railroad track does so at his peril. The company have not only a right of way but such right is exclusive at all times and for all purposes. This is necessary, not only for the proper protection of · the company's rights, but also for the safety of the traveling public. It is not right that the lives of hundreds of persons should be placed in peril for the convenience of a single foolhardy man, who desires to walk upon the track. . . . In this case the plaintiff was not in the employ of the defendants, but was a brakeman of the Lackawanna & Bloomsburg Company. The evidence clearly shows that he was not necessarily on the track when he was struck by the train. He got off his train to perform a duty, to wit, the adjustment of a switch. That duty had been per-formed when he sought to rejoin his train. If in doing this

he saw fit to walk upon the track, he did so at his own risk. His obligation to join his train involved neither a duty nor a necessity to walk where he was struck. It was clearly proved that there was ample opportunity of reaching his train without incurring such a peril. It is true, some of his witnesses say he could not have avoided the track without taking a circuitous route. But a careful examination of the testimony showed that this was based upon the fact that when he started there was a train upon the southern track. It appears from the cross-examination of the plaintiff, that if he had waited a few moments, until the southern bound train had passed, he could have crossed over and walked along the outside of the southern track to his train in perfect safety. It was a mere matter of passing from one given point of the road to another. Whilst so engaged he had no higher protection than a stranger walking over the same ground . . . Passing from one point to another point on the road was not such a duty, unless there had been no other place for him to walk, which was not the case."

This is precisely the doctrine for which I contend. Although as a brakeman whose duty it was to adjust switches and therefore to be upon the track at times, nevertheless, it was not necessary for him to be upon the track at the time and place where he was struck, because he could have walked in the space between the tracks or on the outside of one of them, and therefore he was not protected while walking on the track. No doctrine of ordinary prudence was even offered in support of his occupancy of the track, and if it had been, it would certainly have been rejected in view of what was said in the opinion.

In the case of Aiken v. Pa. R. R. Co., 130 Pa. 380, a foot passenger along a highway crossed by tracks attempted to pass over the tracks—there were ten or eleven of them—and when he had crossed six or seven of them, he and his companion saw an approaching train. The companion stopped in the space where they were standing, but the deceased passed on, and was struck and killed by the train. There was evidence that the tracks were obstructed by standing cars, piles of pipe and railroad ties obstructing the view on one side, and on the other side was an engine blowing off steam. The defendant asked the court for binding instructions which were refused by the court

below. The defendant's third point was "that it was Aiken's duty to stop, look and listen before attempting to cross the tracks; and if the jury should find from the evidence that he did not do so, their verdict should be for the defendant. *Answer:* Affirmed, unless the jury found that the circumstances excused him from that duty, and his failure to do so did not contribute to the accident." The court below also charged the jury as follows: "In reference to the duty of the deceased, it was his duty to do everything that a reasonably prudent man, regardful of his own life, would do to prevent accident, and the question here is, did he?" The whole case was left to the jury because of what were supposed qualifying circumstances of the rule to stop, look and listen, and as a matter of course the jury found for the plaintiff. This court reversed the judgment of the court below without a venire; the opinion was delivered by our brother MITCHELL who, in speaking of the rule of duty, said: " The rule as to stopping, applies equally to persons walking as to persons driving. There is no distinction, in the nature of things, except of degree as to danger, and none is recognized in the cases. . . . It is made quite as much for the safety of passengers on the train as for passengers on the highway ; and the stopping is an essential part of the rule, to enforce attention to the accompanying duties of looking and listening and to secure their performance in something more than a perfunctory and heedless way, in fact to prevent this very thing which cost this unfortunate man his life. It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending ; and the jury can never be permitted to ignore it, to evade it or to pare it away, by distinctions and exceptions."

This jury, under the instructions of the court, had found that a man of reasonable prudence would have attempted to cross the tracks as the deceased did, but this court paid not the slightest attention to the verdict, and utterly repudiated the doctrine of reasonable prudence, although the deceased was a traveler on the highway and had a legal right to occupy the tracks for the purpose of crossing them. If we will not permit the doctrine of reasonable prudence to protect a traveler on the highway in the exercise of his legal right of crossing, how can we possibly permit it to protect a person who deliberately occupies the track and walks along and on the track for a distance

of several thousand feet, and who does not show, and who was not required to show, that there was any necessity for such occupancy. Why should such a person, with certainly no higher right of occupancy than the legal right of a traveler on the highway, be permitted to protect himself with the allegation of reasonable prudence, when we will not for a moment tolerate such a protection for the passing traveler. The latter has a legal right of occupancy, the former can have no right that is higher than a legal right, because the law knows no such right. Why shall the traveler, who simply crosses, be denied a protection which we are about to give to a person who travels thousands of feet on and along the track, between the rails? And why shall we not at least require such a person to show that there was a necessity for such occupancy? To say that he was unlawfully ejected from a train proves nothing as to this question. If his ejection was lawful he has no right of occupancy at all; if he was unlawfully ejected he has a temporary right of occupancy, just as a traveler has, but only for the absolutely necessary purpose of getting to a place of safety. Surely we can not mean to say that such a person has a right to travel on the track till he reaches his destination. That is precisely what Ham did as his own witness Jones testifies. If he has not that right he can not possibly have any other right of continued occupancy than is justified by peremptory necessity. But that is what the court below denied, and declared a new and unheard of right of occupancy of the tracks of a railroad, on the ground of reasonable prudence. We do not tolerate it for any other right of occupancy, why should we do so for this? We deny it to travelers on the highway, we deny it to employees whose duties require them to be on the tracks, we deny it to all other persons no matter what their rights are; we have denied it to this very plaintiff in this very case by a solemn and unanimous decision of this court. We are not referred to a single decision of this or any other court in which a right of indefinite occupancy, limited only by reasonable prudence, has ever been declared, and we have put forth hundreds of utterances upon the subject of the occupancy of railroad tracks by individuals, absolutely at war with any such doctrine.

In the case of Railroad v. Norton, supra, we held that not even the company itself, nor any of its officers or employees,

could occupy the track with any kind of obstruction, animate or inanimate, so as to interfere with the perfectly free and unobstructed use of the road for transportation and travel. After a most exhaustive and elaborate research among the text books, digests and books of reports, I have failed to discover a single instance in which it has been held that any person, whether traveler, official, employee, or ejected passenger, might occupy and travel upon the track of a railroad, upon the doctrine of reasonable prudence, nor upon any other doctrine than that of absolute necessity, and I firmly believe no such case can be found.

Entertaining these views, as I do, with the most profound and abiding conviction of their correctness, I find it impossible to assent to the decision of the court in the present case, and I therefore respectfully dissent from the same. I would reverse the judgment on all the assignments of error except the ninth.