Doyle, J.
 

 This action was brought into this court by petition in error before the passage of the act of April 18, 1883, and the question whether the decree of the district court is so manifestly unsupported by the evidence as to require its reversal, is properly before us.
 

 We cannot undertake, in this opinion, to recite such evidence in detail. We are satisfied with the finding of the district court that Blotter, Sr., was a partner in the firm of Blotter’s Sons, although his name does not appear in the partnership agreement or in the firm name, and hence will pass over the testimony offered upon that issue.
 

 We do not understand, however, that the determination of that question has very much importance in supporting the decree, that the buildings on the real estate were built by the firm, or belonged to the firm. It is quite consistent with the fact of such partnership that the use of the property was contributed by Blotter, Sr., as his contribution to the capital of the partnership, or, in view of the total wrant of capital by the sons, that the firm were tenants of the property. Therefore, to sustain the judgment of the district court there must be evidence quite independent of the partnership itself, that Blotter, Sr., contributed the property to the firm as partnership capital, or that the firm, out of its partnership moneys, paid for the same.
 

 The decree gives the entire improvements to the assignee of the firm, leaving only the naked laud to the individual assignee of Blotter, Sr. We are utterly unable to find any evidence in the record to justify such a decree. That the firm, after the buisness was started, paid some of the bills incurred in completing the buildings, and some of the additions thereto,
 
 *437
 
 may be true ; but that is entirely consistent with the continued ownership of the father, as it is quite evident that much more than was thus paid was advanced in money to the firm during the period of such payments, by the father, in some instances, undoubtedly, for the very purpose of making such payments. Prior to the formation of this partnership, the father purchased .this real estate and commenced the erection of these buildings; they were substantially completed in the fall of 1868, the interior arrangement being all that remained to be done. When the firm actually commenced business in January, 1869, the buildings were substantially ready for the work of brewing. Neither of the sons contributed a dollar up to that time, and neither of them ever had anything to contribute except what was earned by the firm after business commenced. How much that was, it is not difficult to estimate, inasmuch as the firm failed in 1877, with $85,000 of the moneys advanced by Blotter, Sr., in the building of the brewery and other advances of money from his individual means, and moneys borrowed upon the strength of his individual security, unpaid, for which, if it were true that this property was the firm’s, he was either a creditor, or which he was entitled, after the firm debts were paid, to draw out of the concern before his partners could receive any part of the capital .stock; and independently of such amount the firm was wholly insolvent.
 

 We do not doubt that the father built the. brewery, and established the business to give his sons a means of accumulating a competency, as well as to secure himself a certain income therefrom; but that he intended either to give them this property, or to contribute it as capital t.o the firm, which would be the same thing in effect; we are unable to find from anything appearing in the evidence.
 

 There is no paper writing containing any agreement so to do. No witness speaks of any agreement of the kind as being made in terms,, and we are unable to find any facts, proved in the case, from which such agreement is fairly to be implied.
 

 It is admitted, and it is a matter about which there is no conflict in t.he testimony, that the building itself was substantially completed (over $37,000 having been expended thereon),
 
 *438
 
 before the partnership was formed, and that the two sons were wholly without capital. How, then, could this property become the property of the partnership? By gift from the father to the sons of which there is no evidence whatever. By contribution thereof by the father to the capital of the firm, which must be inferred, if found to be the fact, from the conduct of the parties, for there is no direct evidence thereof; or by purchase from the father, by the firm, which is not claimed, and under the evidence cannot be claimed.
 

 There is nothing in the evidence to show, and we do not understand it to be claimed in argument, that there was any reputed joint ownership of this property, which misled creditors. While it is true the property was in the occupation of the firm, that fact alone will not, as between the partners themselves, or between the partners and creditors, convert the individual real property of one partner into joint property of the partnership. There must be something, which amounts to a representation that it is joint property, or conduct justifying the creditor to treat it as such.
 

 The only theory upon which the decree of the district court can be sustained, if at all, is that this property was contributed as capital to-the firm by the father; and although the district court does not so find, yet, as the-evidence is all before us, if it justified that conclusion, a decree properly based thereon would not be disturbed, although a different reason was given for it by the court rendering such decree.
 

 In attempting to imply a contract or agreement, to contribute this property as firm capital from the circumstances, including statements and conduct, it must be borne in mind that it is the acts of the owner which are to be looked to, mainly, for that purpose. The legal title to the land was in Klotter, Sr. He was the admitted owner thereof in fee simple.
 
 Prima
 
 facie, at least, the improvements of a permanent character erected thereon are included in such ownership. No doubt, if this land was purchased during the existence of the firm, and the buildings erected thereon by firm assets, or were the contributive share of one partner to the firm assets, to be used as partnership property, the fact that the title was taken or held
 
 *439
 
 in tbe name of one partner, would not, in equity, make it the individual property of such partner. But when this property was bought, and the greater part of these permanent improvements erected, there was no partnership; there were no partnership assets ; and there was at that time no agreement that the property should ever be subject even to the use of any partnership. The money used in the purchase and erection was the individual money of Blotter, Sr.
 

 Now at the date of the assignment in January, 1877, he treated it as his property. His assignment and that of the firm wrere simultaneously made, and to the same assignee. He included this property in his individual assignment by accurate description. He executed such assignment with the formalities of a conveyance of real estate, while the assignment of the partners was not so executed. While the entire lot on Brown street, of which less than half was covered by the brewery, cost, in 1S66, $4,750, he mortgaged the same in 1875, for $20,000; in 1876 for $1,600 ; and also in the same year, for $6,000, his wife joining with him in each of these mortgages, and in each of them he covenanted that he was the true and lawful owner of the property and had- full power to convey the same. In addition to this he testified upon the trial, in the district court, that he was the owner of the real estate and buildings at the date of liis assignment.
 

 What act of his has made this property partnership property ? What he did not do is of some significance. He never made any conveyance, contract, or other instrument in writing, affecting his title and ownership of the property, nor any de • claration or acknowledgment that the firm, or his sons, had any interest therein. While he frequently said to parties dealing with the firm that he was a partner, there is nothing-in the record which shows that he ever stated to any one that the brewery was partnership property, or that the partnership had any particular amount of capital stock. On the contrary it was the custom of creditors to require his individual indorsement on the firm paper for large amounts, and his custom to give such indorsement, and this too, as the evi
 
 *440
 
 dence shows, after his entire means had been invested in this brewery property.
 

 In view of these facts it would be entirely immaterial what the sons testified to, as to their understanding of what the father intended to contribute to the firm assets. Such understanding or belief, unless based upon some act of his to justify it, would have no binding effect. But wé are absolutely unable to find in their evidence anything that leads us to believe that either of them ever, in fact, had any such understanding. No creditor testifies in the case; the only witnesses are the three Blotters, and an employee who. helped keep the books, and whose testimony on the point we are considering, is immaterial.
 

 The testimony of George Blotter, Jr., upon this point consists of the following questions and answers: “Q. 14. Then neither you nor your brother contributed any part of the capital? A. No, sir; we never were credited up with anything. Q. 15. What did George Blotter, Sr., contribute? A. He paid for the brewery : I don’t exactly know the amount. Q. 16. And the ground the brewery stood upon ? A. Tes, sir.” While the questions call for an opinion of the witness as to what the father contributed to the firm assets, the answers do not attempt to state, directly, that he ever contributed anything. It is strictly true that the father paid for the brewery and land; but assuming that, by fair interpretation, he did say that the brewery and land were thus contributed, it amounts to nothing, because he gives no fact, contract, act, conversation, or conduct upon which his answer, if it bears that construction, is based.
 

 Louis Blotter, the other son, is asked: “ Q. 42. What arrangement, if any, was there made in relation to the payment of rent for the brewery building ? A. There Avas none. Q. 48. Did your father ever speak about any interest upon the capital he had invested in the concern ? A. No, sir. Q. 44. Was there or not any agreement between yourself and your father, that is, your brother and yourself and your father, about rent of the building? No, sir. Q. 45. There was never .anything said ? A. No, sir.” Which questions and
 
 *441
 
 answers furnish the nearest approach to any evidence looking to proof of an agreement by the father, to contribute this property to the firm, found in the testimony of this witness.
 

 Roth of these witnesses testify that certain payments were made by the firm to parties who furnished labor and material in constructing and fitting the brewery for business; but both witnesses agree that such moneys were furnished by their father, and the payments made, usually by George Klotter, Jr., upon directions to that effect from the father.
 

 It is distinctly alleged in the petition that the brewery was built by Klotter, Sr., and that he contributed or put the same into the firm subject to the liens thereon, including the land on which the same was built. If it is not true that he contributed the property to the firm but it continued his individual property, after the partnership was formed, the. payment by the firm of liens upon such separate property would not change its character, whatever equitable right the firm might have to reimbursement.
 

 When the partnership commenced business, books of account were opened by the book-keeper, George Klotter, Jr,, and the greatest reliance is placed upon these accounts to sustain the decree of the district court.
 

 Two of such accounts were offered in evidence, and transcripts of the same are-in the record. One is called “brewery account,” and the other purports to be the account of George Klotter, Sr. Each of these accounts, probably contains the cost of constructing the brewery, including the $37,452 expended in the construction by Klotter, Sr., prior to January 1,1869. George Klotter, Sr., is credited in the first credit item of his individual account with this sum ; and he is also credited with various other sums, amounting, during the year 1869, to about $35,000 and during the entire time the firm was in operation, including the two.amounts already mentioned, to $85,708 more than was drawn by him from the firm. Of course much of this money was used in building the brewery, which, if- we can understand these accounts, cost about $57,000, the balance being. advanced in the purchase of chattels and conducting the business.
 

 
 *442
 
 But are these accounts, or the fact that they were thus kept, and made up of the items contained in them, sufficient, in connection with the other evidence in the case, to warrant a finding that the brewery was constructed with the money of the firm, or that, being constructed with the individual money of Klotter, Sr., was contributed by him as capital to the firm ?
 

 It must be remembered that this was a family arrangement ; that the father was actuated largely by a desire to start his sons in business ; that he was putting his entire m'eans into this brewery and the business in which he was embarking his sons ; that he was not guarding himself and his interests with the care that he would in dealing with strangers ; that his son, George, was to be the book-keeper of the firm, having charge of the office. Nothing would be more natural than that he should expect George to keep his accounts as well as the firm accounts ; and that he should keep them in the firm books was not at all unlikely.
 

 We find here the same absence of proof to give these books the importance claimed for them, that we have noticed in other branches of the evidence. No one swears that Klotter, Sr., ever directed or consented to the accounts being thus kept, or that he ever saw such accounts or knew in what manner they were being kept. Without now questioning the admissibility of these accounts in an action by the assignee of the firm, representing the creditors, against the firm or any individual member of it; or their importance as strong supporting circumstances, we are unable to bring our minds to the conviction that they are sufficient alone, for indeed they stand substantially alone, to support this decree. It is nevertheless true that the rights of the creditors depend in this particular upon the rights of the partners. Unless the junior Klotters are entitled, as against their father, to have this property decreed to be partnership property, the creditors are not. Hence these accounts are of no greater significance here, than if the action was between the partners. As George Klotter,' Jr., was the book-keeper, with exclusive control thereof, they would have very little value as evidence for him in such action, unless
 
 *443
 
 some knowledge of, or assent thereto, on the part of the father, was shown.
 

 In short we find nothing in this record inconsistent with " this conclusion, — that Blotter, Sr., bought the land and built the brewery with his own means, intending to start his sons in business therein
 
 ;
 
 that he engaged in the business with them ; that he advanced all the capital of the firm, with which it purchased the necessary chattel property to carry it on, and also the money necessary to conduct the same; that he made no contract for rent of the real property, or interest on his advances, because he intended to charge none, it being, as he says in his testimony, a family affair, for the benefit of them all, and which, it was contemplated, would result in profits sufficient for them all; but that the real estate, including the buildings, was his individual property, and to remain such. We think this view is strengthened by the partnership agreement, and a fact, not without some significance, that for several years the taxes on the property were charged to the father in his individual account.
 

 Aside from the main question there is a part of the decree which we think is clearly erroneous. While it is found that Blotter, Sr., was the owner of the real estate, upon which the improvements were erected, it is ordered that Goepper, assignee, is entitled to recover of Kinsinger, assignee, the value of such real estate. In other words, if the mortgages are paid, and thus a sale of the property upon the cross-petition of the mortgagees prevented, Goepper is forced to sell to the assignee of the firm, the real estate, at its value; and a master commissioner is appointed to ascertain and report that value. Even if it were found that Kinsinger was entitled to the value of the improvements, or of some portion thereof, to secure to him compensation for such value, as a condition precedent to the restoration of the property to the owner of the fee, is as far as the court could go. It would be analogous to the cases of occupying claimants. It can not take the fee from its owner and transfer it to another, who may have an equitable right to compensation for improvements, or even a lien upon the land itself. See
 
 McCoy
 
 v. Grandy, 3 Ohio St. 463.
 

 
 *444
 
 We do not question the right of the assignee of this firm to enforce in equity the payment to him of the value of any improvements erected by the firm and paid for with firm assets, after the partnership was formed. We arc entirely unable to ascertain from the record what the amount is, if any, which the firm used in that way. Nor do we doubt that any money loaned to the firm by Kiotter, Sr., either as a direct loan or contribution to the firm capital or advanced to the firm, by ■way of gift to his sons, would be firm assets, which if so used would be within this statement. But the
 
 proof is
 
 not such as to enable us to determine any of these matters. The burden of proof in each of these respects is upon the assignee of the firm.
 

 We, therefore, reverse the decree of the district court, and remand the case for further proceedings upon those questions. If, upon a new trial, it is established that such an equitable claim exists in favor of the assignee of the firm, the amount of the same should be ascertained, and the assignee of IClotter, Sr., ordered to pay the same within a reasonable time or, in default thereof, the property be sold. If he does pay it he is entitled to the possession of the real estate, subject to the mortgage liens, about which there is no question made here.
 

 Reversed and remanded.