(76 N. W. Rep. 239.)

---

OLEA C. HAUG *vs.* THE GREAT NORTHERN RAILWAY COMPANY.

Opinion filed April 28th, 1898.

**Carriers—Taking Passenger Beyond Station—Expulsion from Depot— Death By Wrongful Act.**

Defendant received plaintiff's husband as a passenger, but negligently carried him by his station. When the train reached the next station he was put off, against his wishes. He was in an imbecile and helpless condition from intoxication, and this was known to defendant's employes. It was late at night, and the weather was stormy and bitterly and dangerously cold. There were no proper accommodations for travelers at the place except defendant's depot, and shortly after entering the same to wait for a train to take him back to his destination, and while conducting himself quietly, he was ejected from the depot, and driven out into the night, with all its perils for a man in his condition. As a consequence, he died from exposure. *Held,* that the defendant was liable in damages to his widow for his death.

**Pleading—Allegation of Damages Unnecessary.**

In an action brought under the statute by a widow to recover damages for the wrongful killing of her husband, where the complaint shows that the deceased left, surviving him, a widow and minor children of tender years, no specific allegations showing that such widow and children suffered pecuniary damages by the loss of such life are required.

Appeal from District Court, Traill County, *Pollock,* J.

Action by Olea C. Haug against The Great Northern Railway Company, to recover damages, for the death of her husband Jacob C. Haug, alleged to have been caused by the wrongful act of the

railway company. Judgment for defendant on demurrer to the complaint. Plaintiff appeals.

Reversed.

*B. C. Ingwaldson,* for appellant.

*W. E. Dodge,* for respondent.

CORLISS, C. J.    It is difficult to discover from the complaint or the plaintiff's brief the precise legal theory on which she seeks to sustain this action.    Our first impression was against the sufficiency of the complaint, which has been thus far successfully attacked by demurrer.    But on a more careful analysis of·its averments and after eliminating therefrom all immaterial allegations which tend only to obscure the question of liability, we are convinced that the plaintiff has disclosed a state of facts which establish such a breach of duty on the part of the defendant as renders it responsible to her in damages.    The general theory of the action is that defendant's violation of its duty to plaintiff's husband was the cause of his death, and that, therefore, it is bound, under sections 5974-5976 Rev. Codes, to make good to her the damage she has thereby suffered.

As the question arises on demurrer, we are concerned with nothing but the averments of the plaintiff's pleading.    Do they state a cause of action?    Stripped of all unnecessary verbiage, they are, in substance, as follows:    That plaintiff is the widow of Jacob C. Haug; that he left, him surviving, the plaintiff and four minor children, who live with plaintiff; that defendant is a railroad corporation; that on the 2nd day of February, 1895, defendant received plaintiff's husband as a passenger for transportation from Hillsboro to Alton station, in this state; that it negligently carried him by his point of destination; that he was in an imbecile condition from drink, and was helplessly intoxicated, to the knowledge of the defendant and its employes; that on reaching the station next south of Alton, *i. e.* the village of Kelso, the defendant put him off its train, against his wishes; that it was then late in the night, and was stormy and dangerously cold; that at this village there were no proper accommodations for travelers except defendant's depot; that shortly after plaintiff had entered such depot, and while he was quietly waiting for the next train to take him back to Alton, to the knowledge of defendant's agent, and while he was still in such imbecile condition from drink, and helplessly drunk, to the knowledge of such agent, such agent wantonly ejected him from the depot, and drove him out into the night; that it was dangerously and bitterly cold and stormy; that to compel a person, and especially one in his condition, to leave the waiting room, was inhuman, and was to evidently and apparently endanger his life; that plaintiff, so denied all shelter, was forced to and did attempt to walk back towards Hillsboro, the only place where he could find shelter, and

that after hours of walking he finally succumbed to the cold, and died from exposure.

If these facts do not create a liability, it must be because the law deems human life cheap. In the forum of conscience, any human being would be instantly condemned who should treat a helpless drunkard as the deceased was treated by the defendant. The acts of defendant are none the less indefensible because they were performed, as all corporate acts must be performed, by agents. Does, then, the law lag so far behind ethics that conduct like this, which shocks the moral sense, is nevertheless sanctioned by legal principles? We are gratified to find that this question can be answered in the negative. The ground of liability in this case is the disregard by defendant of human life while in the performance of a legal right. When defendant negligently carried plaintiff past the station to which he was bound, it became liable to him for breach of its contract, and was under obligations to return him to that place without charge. But there is no connection between this negligent act and the death which thereafter resulted. Such act was not the proximate cause of his death. Had defendant carried him to a place of safety, and had he died from cold because of his intoxicated condition, no liability would have existed. Nor do we wish to be understood as holding that defendant was obliged to carry him without pay to any point to which he might express a desire to be transported. A traveler who buys a ticket at St. Paul for Minneapolis cannot, when negligently borne beyond his destination, demand that he shall be given a free ride to the Pacific coast. The railroad company has rendered itself liable for its breach of contract, but it has not incurred the obligation to carry the passenger any further than it would be obliged to carry any other passenger who has no ticket and refuses to pay his fare. The duty to carry the traveler, who has been taken past his station through the negligence of the carrier, to a place where his life will not be imperiled, may perhaps be greater than the duty to a willful trespasser, who is conducting himself with violence on the train. But in a general sense, his right to continued transportation is no greater. He must either pay or leave the train when a point has been reached where he will not be exposed to great hazard. Plaintiff in this case cannot complain of the mere fact of the ejection of her husband from the train at Kelso. It is because of the peculiar circumstances surrounding that act, and which made it one necessarily dangerous to human life, when considered in the light of the subsequent conduct of defendant in forcibly removing him from its depot, that the plaintiff may justly hold defendant responsible for the terrible consequences which ensued. To have put him off the train where there were hotel accommodations would have been justifiable, because the defendant was not bound to carry him until he had become sober. Had he, after being ejected at such a place, been run over and killed in the street, or been frozen to death because

of his state of intoxication, defendant could not be held responsible. But no one would contend that it could put him off from the train while in motion. And yet why is this so? The underlying principle applicable in such a case is that a railroad company must not, even when exercising the lawful right of removal, so act as to jeopardize human life. On the same principle, it could not set the passenger out in the midst of a storm on a cold night on the prairie or at a flag station. Neither would the law sanction its act in ejecting him under such circumstances at a station where there were no accommodations for travelers, and where the depot was closed. The defendant in this case owed to plaintiff's husband the duty of carrying him to a point where he, helpless from drink, would not be shelterless against the pitiless fury of a storm, on a bitterly cold night. Whether he was left on the lonely prairie between stations, or at a flag station where there was no depot, or at a village where he could not find shelter except at defendant's depot, which was closed to him or shelter in which was denied to him, the fact would in all the cases be the same,—that it had placed him, a man helplessly intoxicated, to its knowledge, and whom it had negligently carried beyond his destination, in a position from which death or great bodily injury was almost certain to result. The defendant could not expect that a stranger in a place, much less one in such a state of intoxication, would be permitted to enter a private house. It was chargeable with knowledge that his condition was such that he might not even have sufficient control of his faculties to make an effort to do so. It was therefore bound when, despite his protests, it removed him at Kelso, to see to it that the station agent was apprised of the facts, and directed to allow him shelter in its depot until he could be carried back to the place where the defendant should, in the exercise of reasonable care, have originally left him. We do not mean to intimate that it is incumbent upon a railroad company to keep its passenger stations open at all hours of the day and night. And if, under ordinary circumstances, the depot building is closed to the public except when it is necessary it should be open to accommodate the public, no one has any ground for complaint. Assuming that defendant has a right to close its depot as against the general public at the time plaintiff's husband was ejected therefrom, and assuming, further (but the complaint leaves this point in doubt), that what the defendant's agent did in removing her husband was only incidental to the act of closing the depot for the night, yet as against him the defendant had no right to close the depot. When its train reached Kelso with this helpless man on board, because of its own carelessness, it was bound, in view of the climatic conditions and the nonexistence of shelter at that point except in its own depot, to decide whether it would leave him there, in a place of safety, or carry him further, to another place of safety, and, when once it determined to put him off at that point, there sprung up the obligation not to take from him the only shelter the

place afforded. If this shelter was to be denied him, then it was inhuman to drop him at that station at all. It would be in no respect different from leaving him where the depot was already closed, or where there was no depot at all, or at a flag station, or between stations upon a shelterless plain. The wrongful act of the defendant would be in not guarding against the possibility that the station agent, ignorant of the facts, might close the depot, and thrust the unfortunate man, in his helpless condition, out into the dangerous storm. Defendant cannot escape liability because the conductor, without any thought of the dangers of the position of this helpless man, failed to apprise the station agent that the defendant, having carried him by his station, was bound to see that he was not placed in a situation of peril, and that, therefore, he (the agent) must give him shelter in the station. His intoxication was not the proximate cause of his death. It was, it is true, the cause of the defendant being required to exercise greater precaution as to the place of his removal from the train than if he had been sober. The man who voluntarily incapacitates himself by drink is not on this account an outlaw. The law deems his life as precious as that of an Emerson. When the carrier discovers that one helpless from intoxication is upon its train without right, it must, in selecting a safe place to put him off, have regard to his actual condition, physical and mental, without any reference to his responsibility for such condition. The law declares to the carrier that it shall not expose him to great peril even in exercising it undoubted right to eject him; and, in declaring whether he will be subjected to peril, not only must climatic conditions, the propinquity of shelter, and other matters be taken into account, but also the actual state of his mind and bodily health and strength, if known to the agent of the carrier. Though the intoxication of the deceased did cast upon the defendant greater precaution in seeing to it that his life was not imperiled, yet it was not the cause of his death. That cause was the wanton act of the defendant's agent in unnecessarily exposing him, in a state of helpless intoxication, to the cold and storm of a bitter wintry night. The defendant has not even the excuse that it had no chance to prevent his taking passage on its train in this drunken state, for it is averred that his helpless and imbecile condition was known to the company at the time it accepted him as a passenger. There is ample authority for our decision that the facts alleged disclose liability.

In *Railroad Co.* v. *Johnson* (Ala.) 19 South. Rep. 51, it appeared that plaintiff's intestate, who was a passenger on one of its night trains, was very drunk, and refused to pay his fare. Thereupon he was ejected in a cut of the road where there was no escape, except up or down the track, along the sides of which there was room for a person to walk. The night was dark, and it was raining. At the south end there were cattle guards, which could be passed only by walking on the track. Here he was struck, and killed by a train

It was held that the company was liable. The Court said: "If a passenger on a train is intoxicated to a degree to render him unconscious of danger, or he does not possess the power of locomotion, and is put off the train by a conductor on account of his misconduct, and the place where he is put off and left is dangerous to one in his condition, and these facts are known to the conductor, he would be guilty of reckless and wanton negligence, rendering the company in whose employment he is liable for damages resulting from his negligence, although the person ejected and injured might have been legally ejected, in a proper manner and at a proper place. *Tanner* v. *Railroad Co.*, 60 Ala. 621; *Isbell* v. *Railroad Co.*, 27 Conn. 393; *Kerwhaker* v. *Railroad Co.*, 3 Ohio St. 172; *Railroad Co.*, v. *Sullivan*, 81 Ky. 624, 50 Am. Rep. 186; *Johnson* v. *Railroad Co.*, 58 Iowa 348, 12 N. W. Rep. 329; *Kline* v. *Railroad Co.*, 37 Cal. 400; 3 Wood Ry. Law, § § 363, 364; Shear & R. Neg. § 493; 2 Am. & Eng. Enc. Law 748." Again, the Court said: "It is opposed to authority and reason, and the common instincts of humanity, to allow, because a passenger is intoxicated, whether to a greater or lesser degree, and misbehaves in a manner authorizing the conductor to expel him from the train, that such explusion may be made without the exercise of due care for the safety of the passenger, having reference to time, place, and surroundings. If expelled without the exercise of such reasonable care for his life and limb, and he is injured in consequence, the company will be liable, notwithstanding the fact if the passenger had not been drunk he would not has misbehaved, and if he had not misbehaved he would not have been expelled and injured. The right to make reparation rests upon the moral obligation resting upon every one so to exercise his own rights as not to injure another. As was well expressed in *Isbell* v. *Railroad Co.*, supra: 'A remote fault in one party does not, of course, dispense with care in the other. It may even make it more necessary and important, if thereby a calamitous injury can be avoided, or an unavoidable calamity essentially mitigated. Common justice and common humanity, to say nothing of law, demand this; and it is no answer for the neglect of it to say that the complainant was first in the wrong, since inattention and accidents are to a greater or less extent incidental to human affairs. Preventive remedies must therefore always·be proportioned to the case in its peculiar circumstances, to the imminency of the danger, the evil to be avoided, and the means at hand for avoiding it.' " When this case was before the Court on a former appeal (16 South. Rep. 75) the Court said: "There is another principle of law to be observed, which requires of all persons, in the exercise of a right or the performance of duty, that it be done with reasonable regard to the preservation of life, and prevention of great bodily harm, or the infliction of unnecessary injuries to others, and they will be held responsible for the manner in which the right is exercised or duty performed. It is an exceptional case where the law does not sub-

ordinate personal rights to the preservation of life. A conductor has the right, under proper circumstances, to eject a passenger from a car; but he would not be justified in exercising this right while the car was at a high rate of speed, or when upon a high trestle, nor would he be justified in putting off a person who was blind or deaf, knowing his infirmity, except at a safe place. Upon like principles, the law would not justify a conductor in putting off a passenger at a time and place, and under conditions and circumstances, which would expose him unnecessarily to great peril of life or bodily harm; and this, too, whether the danger arose from the natural infirmity of the person or was self-imposed. If the conductor did not know of the infirmity of the person and the peril attending the ejection, there would be no liability arising from the exercise of the right and performance of the duty. It is the fact of notice or knowledge of the danger on the part of the conductor, under such circumstances, that constitutes the act culpable or willfully wrong. If the deceased was intoxicated to the degree that he was unconscious of danger,—could not grasp his position and surroundings, and his duty to avoid danger from passing trains,—or did not possess the power of locomotion, and the place where he was put off and left was dangerous to one in his condition, and these facts were known to the conductor, the conductor would be guilty of such negligence as to render the defendant liable for damages resulting from such misconduct, although the deceased may have been a trespasser on the train, and might have been legally ejected, in a proper manner and at a proper place."

In *Railroad Co.* v. *Sullivan,* 81 Ky. 624, 50 Am. Rep. 186, it was held that the defendant was liable when it expelled from its cars, because he refused to pay his fare, a passenger who was helplessly drunk, the defendant knowing of his condition, he being expelled, not at a station, but in the snow. As a consequence of this expulsion at such a place he was severely frozen, and the defendant was held liable therefor.

In *Railroad Co.* v. *Valleley,* 32 Ohio St. 345, the Court said: "It might, perhaps, as far as this case is concerned, be conceded that, if a man were so intoxicated as to be without reason, sense, or intelligence, it would be unlawful, as it would be inhuman, to expel him from cars at night, where he would be just as likely as not to lie down upon the rails and go to sleep. We may concede further, that to put off a drunken man, during a bitterly cold night, in the woods, far from any house, when the probabilities were that he would freeze to death before help could reach him, would be as indefensible in law as it would be wicked and cruel in fact. And, further, to put a man off in a dark night, upon a high railroad bridge, or upon the brink of a precipice, where the first step would be destruction, this could find no justification in law. All this might possibly be."

In *Railroad Co.* v. *Weber,* 33 Kan. 543, 6 Pac. 877, the Court

say, at page 554, 33 Kan., and page 884, 6 Pac. Rep.: "The duty of the railroad company, however, with respect to Weber, did not end with his removal from the train. He was unconscious, and unable to take care of himself. The company could not leave him upon the platform helpless, exposed, and without care or attention. It was its duty to exercise reasonable care and diligence to make temporary provision for his protection and comfort. As was said by the learned Court who tried the case: 'Of course, the carrier is not required to keep hospitals or nurses for sick or insane passengers, but, when a passenger is found by the carrier to be in such a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity towards him until some suitable provision may be made.' "

In *Conolly* v. *Railroad Co.*, 41 La. Ann. 57, 5 South. Rep. 259, and 6 South. Rep. 526, the Court said: "But none of those cases hold that this right of exclusion can be exercised inhumanly, or without due care and provision for the safety and well being of the ejected passenger. On the contrary, the duty of exercising such care and provision is universally recognized."

In *Railroad Co.* v. *Pitzer*, 109 Ind. 179, 6 N. E. Rep. 310, and 10 N. E. Rep. 70, the Court, referring to some of the cases already cited, said: "These are cases—extreme ones, it may be—illustrating the doctrine that regard must be had to the helpless condition of one who enters a railroad train, and that those in charge of the train must do no act which is cruel or inhuman. Granting that these cases are extreme ones, still the general doctrine which they assert is undeniably a sound one, for through all the cases runs the principle that what humanity requires must be done by those who act with knowledge of another's helplessness."

In *Roseman* v. *Railroad Co.* (N. C.) 16 S. E. Rep. 768, the Court said: "But where the power expressly given by law is exercised in such a manner as to willfully and wantonly expose the ejected person to danger of life or limb, the company is still liable for injury or death resulting from the expulsion. Cases falling within this last exception to the general rule, and not intended to be included under the statute, arise where the persons ejected are manifestly too infirm to travel, or too much intoxicated to be trusted to find the way to the nearest house or station. 3 Wood Ry. Law, § 362; 2 Shear & R. Neg. § 493; *Railroad Co.* v. *Wright*, 68 Ind. 586."

In *Brown* v. *Railroad Co.*, 51 Iowa, 235, 1 N. W. Rep. 487, the Court said: "In exercising the right of ejection, reasonable and ordinary care should be employed. In determining whether such care has been exercised all the circumstances should be considered as the physical condition of the person ejected; the time, whether in daylight or late at night; the condition of the country, whether thickly or sparsely settled; the place of the ejection, whether near to or remote from dwellings of any character, including stations; the character of the weather, whether pleasant or inclement, etc. The rules of law, as well as the dictates of humanity, require that

the ejection shall occur at such place, and be prosecuted in such manner, as not unreasonably to expose the party to danger."

Judge Elliott says, in his work on Railroads (section 1637) : "If he is so intoxicated or so young or feeble as not to be able to take care of himself or look out for his own safety, the company should exercise reasonable care to see to it that he is not expelled and abandoned in such a place, and under such circumstances, that he will be exposed to unnecessary peril.".

All the cases which recognize the right of the carrier to eject the passenger who has no ticket, and refuses to pay his fare, assert that this right must be exercised in such a manner as not to imperil the life of the passenger, or subject him to danger of bodily injury. See, as supporting this principle, the following decisions, which are more or less in point : *Railroad Co.* v. *Glass,* 60 Ga. 441 ; *Railroad Co.* v. *Gilbert,* 64 Tex. 536 ; *Railroad Co.* v. *Rosenzweig,* 113 Pa. St. 519, 6 Atl. Rep. 545 ; *Ham* v. *Canal Co.,* 155 Pa. St. 548, 26 Atl. Rep. 757 ; *Rudy* v. *Railroad Co.,* 8 Utah 165, 30 Pac. Rep. 366 ; *Gill* v. *Railroad Co.,* 37 Hun. 107 ; *Railroad Co.* v. *Skillman,* 39 Ohio St. 444 ; *Railroad Co.* v. *McDonald,* 2 Willson. Civ. Cas. Ct. App. 144 ; *Hall* v. *Railroad Co.,* 28 S. C. 261, 5 S. E. Rep. 623 ; *Wyman* v. *Railroad Co.,* 34 Minn. 210, 25 N. W. Rep. 349. See, also, *Weymire* v. *Wolfe,* 52 Iowa 533, 3 N. W. Rep. 541 ; *Isbell* v. *Railroad Co.,* 27 Conn. 393.

The complaint shows with sufficient clearness that the death which resulted was proximately caused by the defendant's wrongful act. The order sustaining the demurrer is reversed. All concur.

ON REHEARING.
November 12, 1898.

BARTHOLOMEW, C. J. There is one question involved in this case that was not disposed of in the original opinion. It was not mentioned in oral argument upon the first hearing, and, while it was briefly treated in respondent's brief, yet we overlooked it, and hence, on respondent's petition, we ordered a reargument.

It is urged that the complaint contains no specific allegations showing that this plaintiff or the heirs of Jacob C. Haug have suffered any pecuniary loss or damage by reason of his death, and that only actual pecuniary damages can be recovered in an action of this character, and that the law does not presume damages from the single fact of death; hence, unless the complaint contains specific averments of damages, it fails to state a cause of action. It will be noticed that the cause of action in this case, if any there be, accrued on February 3, 1895. The Compiled Laws of 1887 were then in force. The action was not commenced until 1897. The Revised Codes of 1895 were then in force. The cause of action here sought to be enforced was unknown to the common law, and hence must depend entirely upon statutory provisions, and the provisions giving this right of action, as set forth in section 5499 of the Compiled Laws, differ somewhat from provisions giving

the right of action, as set forth in section 5974, Revised Codes. We are not prepared, however, to say that the rule of pleading would be different under the one statute or the other. But, if there be a difference in liability under the two statutes, then, clearly, under the provisions of section 5142, Rev. Codes, this action must be regarded as brought under the provisions of section 5499, Comp. Laws, which was in force when the cause of action accrued. That section reads: "If the life of any person·or persons is lost or destroyed by the neglect, carelessness or unskillfulness of another person or persons, company or companies, corporation or corporations, their or his agents, servants or employees, then the widow, heir, or personal representatives of the deceased shall have the right to sue such person or persons, company or companies, corporation or corporations, and recover damages for the loss or destruction·of the life aforesaid." That was the modified form, in force in this jurisdiction, of Lord Campbell's act, passed in 1846, which first brought causes of action of this character into existence. Statutes based upon Lord Campbell's act are now inforce in nearly or quite all of the states in this Union. This statute has been often before the Courts, and this very question of pleading which we are now considering has been repeatedly passed upon. The question is new in this jurisdiction, and, when we consult the adjudged cases, we find them to be in some confusion, and perhaps some conflict. Difference in phraseology may account in part for the diversity of opinion among judges, but we think there are cases that cannot be reconciled. Upon one point the cases are united, and that is that the only damages recoverable in this action are for the pecuniary loss. Nothing can be recovered for the loss of society or for damages in the way of solatium. But the cleavage in the authorities arises upon the question of the presumption of any pecuniary damages arising from the fact of death.

The first case in England wherein the point arose is *Chapman* v. *Rothwell*, El., Bl. & El. 168. In that case the declaration was filed by the husband, as administrator, to recover damages for the death of his wife. The allegations simply set forth the facts showing the negligence of defendant resulting in the injury and death of the wife, and added: "And the plaintiff, as administrator as aforesaid, claims 200 pounds." There was a demurrer to the declaration. Lord Campbell, the author of the act giving the right of action, was then chief justice. Upon the argument of the demurrer the attorney for the defendant made the statement that "no pecuniary injury is shown to have accrued to the plaintiff." Lord Campbell replied: "The damages might be proved by evidence under this declaration." And Crompton, J., said: "Section 1 appears to contemplate giving damages whenever the party injured could have recovered them, whether nominal or more;" and the point was overruled. It may be that this.ruling is to some extent weakened by the language of Baron Pollock in the subsequent case

of *Duckworth* v. *Johnson,* 4 Hurl. & N. 653, where he says: "If there were no damages the action is not maintainable. It appears to me that it was intended by the act to give compensation for damages sustained, and not to enable persons to sue in respect to some imaginary damages, and so punish those who are guilty of negligence by making them pay costs." But this language is not necessarily at variance with the decision in *Chapman* v. *Rothwell,* and ought not to be held to establish a diffent rule of pleading. It would therefore seem that in England there need be no special allegations showing damages.

In an early case under the New York statute (*Safford* v. *Drew,* 3 Duer, 627), Justice Duet held that it was necessary, under the statute, to show the existence of parties who were entitled to the benefit of the action, and that such parties had suffered pecuniary loss, and said: "These facts are in their nature material and issuable, and in actions like the present one are, therefore, in my judgment, just as necessary to be proved upon the trial, and, consequently, to be averred in the complaint, as the death of the person injured, and the wrongful act or neglect of defendant as the primary cause." If the able justice intended to say that the complaint must contain specific allegations as to the character of, and reasons for, the damage, then, as we shall see, the case has not been followed in New York. But in *Regan* v. *Railroad Co.,* 51 Wis. 599, 8 N. W. Rep. 292, it was held that the complaint should allege facts showing that a present or prospective pecuniary loss or injury had resulted to the relatives in whose behalf the action was brought, and cited the case in 3 Duer in support of the position. The same rule of pleading under this statute has been adopted in Michigan. *Hurst* v. *Railway Co.,* 84 Mich. 539, 48 N. W. Rep. 44. It should be noted in this case, however, that the action was brought to recover damages caused by the death of an infant less than two years of age. A general allegation of damage was held bad in *Charlebois* v. *Railroad Co.,* 91 Mich. 59, 51 N. W. Rep. 812, where the action was to recover damages for the death of an infant eight years of age. In Texas, also, it is held that the doctrine of nominal damages does not apply. *McGowan* v. *Railway Co.,* 85 Tex. 289, 20 S. W. Rep. 80. In that case it was sought to recover damages for the death of a wife. We do not understand the Supreme Court of Texas to hold that a general allegation of damages is insufficient as a matter of pleading. But it does hold that actual damages must be shown. It is perhaps proper, while the cases are not clear upon the subject, to place Nebraska among the states which require the damages to be specially pleaded. See *Electric Co.* v. *Laughlin,* 45 Neb. 390, 63 N. W. Rep. 941; *Orgall* v. *Railway Co.,* 64 N. W. Rep. 450. And perhaps, also South Dakota. *Belding* v. *Railway Co.,* 53 N. W. Rep. 750.

On the other hand, very eminent Courts have held that a general

allegation of damages was sufficient, under these statutes; that special allegation of damages were not required; and that nominal damages might be recovered. *Railway Co.* v. *Shannon,* 43 Ill. 338; *Railway Co.* v. *Swett,* 45 Ill. 197; *City of Chicago* v. *Scholten,* 75 Ill. 468; *Gorham* v. *Railway Co.,* 23 Hun. 449; *Lehman* v. *City of Brooklyn,* 29 Barb. 234; *Ihl* v. *Railroad Co.,* 47 N. Y. 317; *Oldfield* v. *Railway Co.,* 14 N. Y. 310; *Railway Co.* v. *Weber,* 33 Kan. 543, 6 Pac. Rep. 877; *Johnston* v. *Railroad Co.,* 7 Ohio St. 337; *Nagel* v. *Railroad Co.,* 10 Am. & Eng. R. Cas. 702; *Serensen* v. *Railroad Co.,* 45 Fed. 407; *Kenney* v. *Railroad Co.,* 49 Hun. 535, 2 N. Y. Supp. 512; *Atrops* v. *Costello,* 8 Wash. 149, 35 Pac. Rep. 620; *Barnum* v. *Railroad Co.,* 30 Minn. 461, 16 N. W. Rep. 364.

In *Korrady* v. *Railway Co.,* 131 Ind. 261, 29 N. E. Rep. 1069, Chief Justice Elliot, speaking for the full bench, said: "The appellee's contention that the complaint is bad because it does not specifically show that actual damages were sustained by the widow and infant children of the appellant's intestate cannot prevail. Where a complaint charges a railroad company with wrongfully killing a person, shows that the person so killed was free from contributory fault, and that he left a widow and infant children surviving him, a cause of action is stated, although it is not directly alleged that the surviving kinsfolk sustained actual damages. The legal presumption is that infant children are entitled to the benefit of the father's services, and that the wife is entitled to the benefit of the services and assistance of her husband, and that such services are of value to her and her children."

These citations are sufficient to show that the decided weight of authority is opposed to the rule requiring a specific allegation of damages in order to constitute a good complaint. It is true that some of the cases go upon the theory that, when the wrongful act of the defendant is once established as the proximate cause of the death, the statute then bases a cause of action upon such wrong, and will presume nominal damages. But the more general holding is to the effect that, the wrongful act being once established as the cause of death, the decedent being free from fault, the plaintiff may, under a general allegation of damages, recover all such damages, within the amount claimed, as are ordinarily and usually sustained, from the loss of such life, by those standing in the relation to the decedent sustained by those in whose interest the suit is brought. This holding, we think, violates no rule of code pleading. The defendant is always sufficiently advised as to what he must meet on the question of damages. Any facts or circumstances tending to reduce the pecuniary value of the life destroyed may always be shown. The case of *Atrops* v. *Costello,* supra, well illustrates this principle.

There is a distinction noticed in some of the cases that we think is founded upon reason. When the party in whose interest the suit is brought sustained such relations to the deceased that he

had the legal right to demand the services of the deceased, or to demand support and maintentnce at the hands of the deceased, then substantial pecuniary damages will be presumed; while if recovery is sought by a collateral relative, or one having no such legal claim, and who was not in fact dependent upon the deceased, the presumption of substantial damages may not be indulged. This is illustrated in *City of Chicago* v. *Scholten,* 75 Ill. 468; *Coal Co.* v. *Hood,* 77 Ill. 68; *Winnt* v. *Railway Co.,* 74 Tex. 32, 11 S. W. Rep. 907.

In this case we make our holding no broader than the facts require. The complaint discloses that the deceased left a widow and minor children of tender years. There is a general allegation of damages, but no facts pleaded showing in what such damages consist. The wife and minor children were entitled by law to demand support and maintenance at the hands of the husband and father. When, by the wrongful act of the defendant, they are deprived of that husband and father, the law presumes pecuniary damages, and particular facts showing damages need not be pleaded.

Our judgment of reversal must stand. All concur.