### NEW YORK, CHICAGO & ST. LOUIS RY. CO. v. W. L. WILLING.

1. LIABILITY OF RAILWAY FOR UNLAWFULLY EJECTING PASSENGER BETWEEN STATIONS.

A person lawfully on a train and unlawfully put off at a point on the railway track where there is no station and no stopping place, who is injured in walking upon a cattle guard at the next highway while going along the railway track in order to reach his destination, may recover for such injury.

2. EXCEPTION—KNOWLEDGE OF PASSENGER THAT TRAIN DOES NOT STOP AT HIS STATION.

A person who goes upon a train knowing that it does not stop at his destination and refuses to pay fare to the next station at which it does stop, may be put off at any reasonably safe place. The railway company is not required to carry him to the next station or highway or to a place where it will be convenient for him to get off.

HEARD ON ERROR.

C. P. & L. W. Wickham and J. H. Clark, for plaintiff in error.

Jesse Vickery, for defendant in error.

### HULL, J.

The defendant in error, plaintiff below, brought his action in this case to recover damages for being wrongfully and unlawfully put off the train of the railroad company in the month of May, 1900, at a point between the town of Bellevue and the village of Kimball on the line of the railroad company. The plaintiff recovered a verdict for $810. The mo-

tion for a new trial was overruled and judgment entered thereon, and it is to reverse this judgment that proceedings were commenced in this court.

The plaintiff claims that he was at the village of Arcadia, Hancock county, on the line of the railroad company, on the night of May 5, 1900, and he desired to go to Kimball in Erie county. He wished to take the train at Arcadia late at night (about eleven o'clock), and it is claimed that he asked the ticket agent at Arcadia if the train stopped at Kimball and the ticket agent told him that it did. Willing claimed he asked the agent how much the fare was and the agent replied that he did not know, as he was a new man, but that the train was a local train, stopping at all stations, and that it stopped at Kimball, and that he might pay his fare on the train as well as to buy a ticket, and that he got on the train after receiving this information. He claims that he paid the conductor on the train his fare between Arcadia and Bellevue, and that at the time he paid him he was told by this conductor that he would get off at Bellevue and that he could not take his fare to Kimball, but he could pay it to the conductor that would get on the train at Bellevue, at the end of the division. He claims he proceeded on his way to Bellevue, accompanied by a friend by the name of Howard, who got off at Bellevue, and Willing, the plaintiff below, stayed in the car and went out on the train in the direction of Kimball.

After he had gone a short distance from Bellevue he was informed by the brakeman and conductor that the train did not stop at Kimball. Willing claims he told the conductor that he had been informed by the ticket agent at Arcadia and also by the conductor in charge of the train from Arcadia to Bellevue that the train did stop at Kimball. The conductor told him the train would not stop until they reached Lorain, and that he would either have to pay his fare to Lorain, or get off—he could take his choice. Willing said he would rather get off, and thereupon the conductor pulled the rope, as he says, in an "angry manner," and the brakeman opened the door and he was ordered out of the car and off the train at a point perhaps three miles east of Bellevue, just at the edge of the yards where the sign "yard limits" stands, and about half way between Bellevue and Kimball, the latter place being about seven miles east of Bellevue. No physical violence was used in putting him off the train, and after he got off he concluded to go on to Kimball to the house where he intended to go, instead of going back to Bellevue, the distance being about the same.

After starting on his way, a short distance from where he was put off, there was a highway crossing the railroad track, and without seeing it, Willing claims he stepped on to and walked upon a cattle guard, and

his foot turned and his ankle was sprained and he claims he was quite severely injured.

On the other hand, the railroad company denied that any such information as this was given to Willing at Arcadia when he purchased his ticket, and the conductor on the train from Arcadia to Bellevue denied that he made the statements testified to by Willing, and his testimony as to what occurred between Bellevue and the place where he was put off was denied in some particulars.

A large number of exceptions were taken to the introduction and exclusion of evidence. While there was some testimony admitted perhaps that might have been excluded, we find, on examination of the whole record, no error in this behalf to the substantial prejudices of the plaintiff in error.

It was contended by plaintiff in error that Willing's injuries which he received, if he received any on account of stepping on the cattle guard, could not and should not be permitted to sustain his claim for damages in any particular; that such injuries were not the natural or probable result of his being put off the train in this manner. We think, however, if he was lawfully on the train and unlawfully put off at a point on the railroad track where there was no station and no stopping place and from which it would be necessary for him to go either to his destination or back to Bellevue, we think if those were the facts, and if without any negligence on his part he was injured in walking upon the cattle guard, as he claims he was, that this would be an element that might be included in his claim. If the company wrongfully and unlawfully put him off the train at such a point in the night they could not be heard to say that he ought not to recover for such injuries as those which resulted from his being so put off the train.

Testimony was introduced as to his injuries,—as to the result of this sprained ankle and his own conduct afterwards—his limping and other indications of lameness and pain. We think that admitting testimony such as this, while rather close to the line, was not error under all the circumstances.

Witnesses were permitted, however, to state what he said on different occasions, some time after his injury—that his ankle hurt him and similar expressions. This testimony, we think, ought not to have been admitted. Express declarations like these a long time after the injury, that his ankle pained him, or hurt him, ought to have been excluded.

A certain piece of evidence that was introduced and which was objected to by the railroad company, was an almanac showing the time the moon set on the night in question. It has always been the rule as far as we know, to admit almanacs in evidence, and upon examination of Jones

on Evidence, we find that there is authority for it. In Jones on Evidence, Sec. 594, where there is a brief discussion of almanacs along with scientific and medical works, we find this language :

" On the same principle almanacs have been admitted to prove at what hour the sun or moon rose at a given time. Although since this is a fact of which the court will take judicial notice, the evidence may be unnecessary, or it may be deemed as used for the purpose of refreshing the memory of the court and jury."

We think it was not error to admit the almanac.

Quite a large number of requests to charge the jury were made by the plaintiff and by the defendant, and many of them were given.

Among the requests that were given on behalf of the plaintiff below was request No. 6, which reads as follows:

" If you find from the evidence that the plaintiff at the time this train left Bellevue, knew that this train did not stop at Kimball, and if you find that he refused to pay his fare from Bellevue to Lorain, the conductor would have a right to eject the plaintiff from the train, but he would have no right to eject the plaintiff late at night, if the night was dark, in the country, far from a railroad station, if by so doing such passenger so ejected would thereby and as a natural and probable consequence be exposed to danger."

To the giving of this instruction exception was taken by the railroad company and error is claimed from it here. It was claimed by the railroad company on the trial of the case, that the plaintiff's claims in regard to his information, were false; that he knew that this train did not stop at Kimball; that it was untrue that he had been informed by the ticket agent at Arcadia, or by the conductor between Arcadia and Bellevue that it did stop; that he got on the train at Arcadia knowing that the train would not stop after it passed Bellevue until it reached Lorain; and that he got on the train for the purpose of riding through to Kimball and getting there if possible on this train. So that the chief issue in the case between the parties was whether the plaintiff below had been misled in getting on this train; had been misinformed by the agent of the railroad company as to its stopping at Kimball. It was conceded by all parties that if he knew this train would not stop at Kimball, knew it was a fast train from Bellevue east, that he had no right to get on to it and that the railroad company would have the right to eject him. But it was claimed that although they had the right to eject him under those circumstances, that they did not have the right to eject him in the manner and at the time and place that they did, to wit, at a point between Bellevue and Kimball, where there was no depot nor stopping place and from which he would have to walk some distance to

get off the right of way upon a public highway, and this instruction was drawn to meet the plaintiff's view of the case.

The only danger that the plaintiff below encountered when he was put off the train, was the cattle-guard; it was the only danger from which he suffered any physical injury. That was the only danger and could be the only danger that the jury would have had in mind and to which their attention had been called. There were no dangers surrounding him when he was put off, or surrounding the place any more than are usual at and about a railroad track. It was an ordinary railroad right of way, with tracks and ties, and the company were required to put cattle-guards at highways wherever they crossed their right of way, and it might be presumed that cattle-guards were somewhere near by. The night was perhaps dark; the moon had just set or was about to set. It was not, however, a stormy night, and probably, according to the testimony, was a clear night; it was early in May and the weather was not inclement. There were no unusual perils near or about him when he was put off; no precipice or bridges or anything of that character.

It seems to us that this instruction cannot be sustained by the authorities; it goes too far. Under it, it is difficult to see how the jury could have avoided returning a verdict in favor of the plaintiff, when they were instructed that although they could find that the plaintiff knew that he had no right to be upon this train; that it did not stop at Kimball; that he refused to pay his fare from Bellevue to Lorain; and although the court told the jury that the conductor would have the right to eject him, but that if he did, he would have no right to eject him late at night, if the night was dark, in the country, far from a railroad station, if by so doing, such passenger so ejected would thereby and as a natural and probable consequence, be exposed to danger.

Putting all these things together, it amounted practically to an instruction to the jury that if he was put off under the circumstances which were substantially admitted surrounded him at the time he was put off, although he knew he had no right to be on the train, and in fact' had no right to be there, yet he would be entitled to recover.

We think the instruction is faulty and defective in this, that it does not limit the danger to any unusual or serious danger, or any danger of an extraordinary character, but simply instructs the jury that if he was thereby, as a natural and probable consequence, exposed to danger, he would be entitled to recover.

There are two decisions of the Supreme Court of the state which are in point on this question. In Railway Co. v. Skillman, 39 Ohio St. 444, the Supreme Court say in the syllabus:

Railway Co. v. Willing.

"A person entering the cars, without having purchased a ticket, and persistently refusing to pay the full and reasonable fare, upon demand by the conductor, and after reasonable time in which to determine whether he will or will not pay the same, may lawfully be removed from the train.

"The expulsion of such person may be at a place other than a railroad depot, or usual stopping place, provided care is taken not to expose him to serious injury or danger.

"Such person acquires no right to remain on the train, by offering to pay the usual fare after the train had been stopped for the purpose of ejecting him."

This was a case where a man had got on the train without paying his fare; the regular fare, if he bought a ticket, would have been twenty cents, but under the rules of the company, if he paid his fare on the train, it would be twenty-five cents. He refused to pay the extra five cents until the train was nearly stopped, then he offered to pay the twenty-five cents, but he was put off the train, and the Supreme Court held that the railroad company had a right to put him off, even if he did offer to pay the extra fare after he had once refused, and the train had been stopped, or practically so, on account of his refusal. The court say, on page 453, of the opinion:

"The plaintiff also excepted to the charge of the court of common pleas, that when payment of the fare demanded was refused, the defendant had the right to eject him from its train, and also to the refusal of the court to charge, as requested by the plaintiff, that 'the defendant railroad company had no right to expel the plaintiff from its cars, except at a railroad depot, or stopping place.' Of the defendant's right to eject the plaintiff from its car for a persistent refusal to pay his fare from the station at which he entered the car to the next station, there can be no serious question, provided he was not removed with unreasonable violence, or at a place where he would be exposed to serious injury or danger. When he refused to pay the usual fare he had no right to remain on the train, or claim the right of a passenger, but might rightfully be treated as a trespasser, and be at once expelled. To hold that this could only be done at a railroad depot, or stopping place, would deprive a railroad company of its chief safeguard against that kind of fraud or imposition, and we know of no principle of law, or public policy, which requires that every one who prefers not to pay his fare shall be carried without charge from the station at which he gets on the train to the next station.

"We see no error in the charge of the court of common pleas, that, 'when, for such refusal to pay, the train was stopped for the purpose of

ejecting the plaintiff, his right to transportation was not restored by afterward offering to pay the fare so demanded; especially when taken in connection with the instruction also given to the jury, that the plaintiff was entitled to a reasonable time, after the demand was made, to consider whether he would pay the sum demanded."

It will be noticed that the court use the words, "provided care is taken not to expose him to *serious* injury or danger." It is not left simply with the words, "provided he is not exposed to any danger." But he must be exposed to something more serious—some danger more serious—than simply being put off the train onto the railroad track. If this were not the rule, it might be almost impossible for railroad companies to run fast trains without stopping them at almost every station; and every trespasser who got on such a train in the night or in the evening without a ticket and without fare and refused to pay his fare, could insist on being carried to the next station or that he should not be put off until some place convenient for him was found. This would very much interfere with the running of such trains and practically prevent it.

Another case is found in Railway Co. **v.** Valleley, 32 Ohio St. 345. The court say in the syllabus:

" It is not only the right of a conductor to expel from a train a drunken, unruly, boisterous passenger, but when such a person endangers, by his acts, the lives of people, it is the duty of such conductor to remove such passenger in order to protect others from violence and danger.

" But this right must be reasonably exercised, and not so as to inflict wanton or unnecessary injury upon the offending passenger, nor so as to needlessly place him in circumstances of unusual peril.

" If having exercised reasonable prudence, considering the time, place and circumstances, as also the condition of the drunken man himself, the conductor expels such passenger, who is afterward run over and killed by another train not in fault, the expulsion itself is not such proximate cause of the death as will make the company liable."

It will be seen that the Supreme Court, in the second paragraph of the syllabus, use the expression, " nor so as to needlessly place him in circumstances of *unusual* peril." In this case, the man was intoxicated, and he was put off the train at a place not a station and was run over and killed by another train.

We understand the law to be that if a man is on a train unlawfully, as a trespasser, that the train may be stopped and the man put off at a reasonably safe place; that the railroad company is not required to carry him to the next station or to the next highway or the next place that would be convenient for him to get off. He has no claims upon the

company; he is not paying for his transportation; he is a trespasser upon the train, and they have a right to relieve themselves of him as speedily as possible, but without exposing him to any unusual or extraordinary danger. The mere fact of putting him off the train on the railroad track or within the right of way, in the night, if he is unlawfully on the train, is not exposing him to unusual or extraordinary peril.

In our view of this case, if Willing knew that this train did not stop at Kimball and remained upon it at Bellevue and refused to pay his fare, then the conductor had the right to put him off where he did, and there would be no liability on the part of the railroad company, if those were the facts.

Counsel, in drawing this request, must have overlooked the language of the Supreme Court to which attention has been called and, in our judgment, it was error for the court of common pleas to give the instruction to the jury. For this reason the judgment of the common pleas must be reversed and the verdict set aside.

---

### SHERIFFS—REWARDS.

Sandusky (6th) Circuit Court, January Term, 1903.]

Haynes, Parker and Hull, JJ.

### ISAAC BROWN V. SANDUSKY COUNTY (COMRS.).

SHERIFF NOT ENTITLED TO RECOVER GENERAL REWARD FOR ARREST OF CRIMINAL.

A sheriff in a sister state, arresting a fugitive from justice under a warrant and pursuant to a notice from a sheriff in this state, describing such fugitive and indicating the place where he may be found, acts strictly within the line of his duty as an officer, and is entitled only to such reward or compensation as is allowed him by law, and cannot recover from county commissioners in this state a general reward offered by them for the apprehension of such fugitive under Sec. 918 Rev. Stat.

Kinney, O'Farrell & Rimelspach, for plaintiff in error.

Geo. H. Withey, prosecuting attorney, for defendants in error, cited: 2 Kent Commentaries, 118, 183, 184, 454, 455, 463; Gilmore v. Lewis, 12 Ohio 281; Rea v. Smith, 12 Re. 398 (2 Handy 193); 21 Am. & Eng. Enc. Law (1 ed.) 400; Smith v. Whildin, 10 Pa. St. 39 [49 Am. Dec. 572]; Spurgeon v. McElwain, 6 Ohio, 442, 444 [27 Am. Dec. 266]; Clark Contracts 184, 186, 418n., 502; Story Conflict Laws, Sec. 244; Oscanyan v. Arms Co., 103 U. S. 261; McCann v. Pennsylvania Co., 6 Circ. Dec. 610 (10 R. 139); Cincinnati, H. & D. Ry. Co. v. Morris, 6 Circ. Dec. 640 (10 R. 502); Moore v. Cassily, 9 Circ. Dec. 305 (16 R. 708); Leavans v. Bank, 50 Ohio St. 591 [34 N. E. Rep. 1089]; Ott v.